UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAMBRIDGE CAPITAL LLC,<br><br>Plaintiff,<br><br>— against —<br><br>RUBY HAS LLC,<br><br>Defendant. | Case No.  20-11118<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cambridge Capital LLC ("Cambridge") by and through its undersigned counsel alleges as follows:

1.       This action seeks to hold a company accountable for breaking its contracts, cheating its business partners, and backing out of an agreed-upon investment deal once the prospect of something better came along.

2.       Defendant Ruby Has LLC ("Ruby Has") is an ecommerce fulfillment company. Founded in 2011, Ruby Has operates six warehouses in the United States and Canada.  In those warehouses, Ruby Has stores inventory for its clients and picks, packs, and ships its clients' products as they are ordered online.

3.       Plaintiff Cambridge Capital LLC ("Cambridge") is a private equity firm that invests in supply chain companies.  To do so, Cambridge employs professionals with deep experience in logistics, including individuals responsible for building several of the largest companies in the sector.  Over the last decade, these professionals have invested over $1.5 billion in over 20 companies and have deployed more than $1 billion more in dozens of corporate acquisitions.  Cambridge is highly sought out not merely for its investment capital, but also for its operational expertise and strategic guidance.

4.     Beginning in 2018, executives from Ruby Has repeatedly reached out to Cambridge concerning a potential investment in their business.  After declining to proceed on several occasions, in June of 2020, Cambridge agreed to move forward with a potential investment through which it would acquire a 51% interest in Ruby Has.

5.     On June 25, 2020, the parties executed a detailed, six-page Letter of Intent ("LOI") setting forth the key parameters of the deal.  Under its terms, Cambridge would invest $40 million, half of which would be used to recapitalize Ruby Has and half of which would be used to provide liquidity to existing owners.

6.     In the Letter of Intent, Ruby Has specifically agreed to a 120-day exclusivity period during which it would not "solicit or initiate any Investment or Acquisition Proposal… or disclose any non-public information…to any other person or entity except Cambridge."  This exclusivity period was critical, as Cambridge did not want to invest substantial time into performing the business diligence and operational analysis necessary to purchase a majority interest in Ruby Has only to be bid against another investor once an agreement was finalized. Nor did Cambridge want to develop a plan for Ruby Has to streamline and modernize its business operations only to see the fruits of that labor go to another purchaser.  As a result, Ruby Has and Cambridge discussed the importance of this exclusivity period in depth throughout May and June of 2020. Indeed, Cambridge only agreed to execute the Letter of Intent once Ruby Has consented to the exclusivity period.

7.     During the exclusivity period, which ran through October 25, 2020 and was subsequently extended through December of 2020, Cambridge worked in good faith to perform due diligence, draft the necessary legal documents, and finalize all of specific terms of the deal. Cambridge also provided substantial advice and assistance to Ruby Has, drawing upon its years

of logistics expertise to improve the company's operations, restructure its management team, and introduce it to potential clients and customers.

8.     Cambridge also passed on other potential investments in Ruby Has competitors during the exclusivity period.  Despite being offered attractive investment terms in two businesses that subsequently grew larger than Ruby Has, Cambridge honored its commitment to see through its investment in Ruby Has.  The owners and management of Ruby Has had claimed to be men of their word and Cambridge sought to operate in the same fashion.

9.     On September 14, 2020, Ruby Has and Cambridge agreed upon a final set of terms for the investment.  Having reached complete agreement on all issues perceived to require negotiation, Ruby Has promised that it would execute a formal set of deal documents memorializing those terms once drafted by counsel.

10.    Unfortunately, almost as soon as the parties had reached an agreement, Ruby Has began to renege on its commitments.  First, Ruby Has delayed executing the final deal documents until it could draw up a highly unorthodox, time-consuming, and structurally complex insurance arrangement that it believed would allow it to avoid taxes on the deal, despite realizing close to $20 million in capital gains.  While Cambridge agreed to accommodate this structure for Ruby Has, the Ruby Has demand dragged out the deal for several months and prevented the parties from executing the transaction in September, as Ruby Has had initially promised.

11.    Then, after this tax planning was in place, Ruby Has began making additional economic demands, asking to sweeten the economic terms already agreed-upon.  In particular, Ruby Has demanded additional cash from Cambridge while seeking to disperse as much of the existing Ruby Has assets to existing owners as possible before the deal closed.

12.     This retrading culminated in a heated discussion on December 1, 2020.  After substantial negotiations, Ruby Has agreed to sign the deal documents immediately if Cambridge promised to pay it an additional $2 million in cash at closing.  For the sake of closure, Cambridge accepted this offer and directed Ruby Has to send over the final executed copies of the already-complete documents.

13.     But Ruby Has had other plans.  Despite having agreed to an exclusivity period in which it was forbidden to engage in investment or acquisition discussions with other entities, Ruby Has had actually been engaged in secret talks with Summit Partners, another private equity fund.  In connection with those talks, Ruby Has had provided Summit Partners with confidential business information in clear violation of its promises to Cambridge.  Ruby Has had hoped that by doing so, it could either accept a more lucrative offer from Summit Partners or that it could seek to bid Summit Partners and Cambridge against each other.

14.     On December 2, Summit Partners announced that it had made a $290 million investment in a direct competitor to Ruby Has, an ecommerce fulfillment company called ShipMonk, Inc ("ShipMonk").  Once it learned the details of this other investment, Ruby Has made a brand-new demand – that Cambridge agree to accept a much higher valuation for its business.  Ruby also reached out to ShipMonk directly, despite its exclusivity promise, seeking to start a "bidding war" between ShipMonk/Summit Partners and Cambridge for an interest in Ruby Has.

15.     When Cambridge refused to allow Ruby Has to create a "bidding war" on an investment it had already contracted for in good faith, Ruby Has informed Cambridge that it would renege on the final transaction documents.  To add insult to injury, Ruby Has also refused

to pay for Cambridge's out-of-pocket expenses in connection with the diligence process, despite its unambiguous legal obligation to do so in the LOI.

16.     As a result of the dishonest, faithless behavior by Ruby Has, Cambridge has suffered substantial damages. It has incurred hundreds of thousands of dollars in out-of-pocket expenses in connection with a transaction that Ruby Has reneged on at the last minute. It has provided millions of dollars' worth of advisory services from top logistics industry leaders to a company now looking to sell those secrets to the highest bidder. And it has lost hundreds of millions of dollars in management fees and lost profits from the Ruby Has transaction and the other investments that it was induced to pass upon.

17.     As such, Cambridge has no choice but to bring suit against Ruby Has to vindicate its rights.

## PARTIES

18.     Plaintiff Cambridge is a limited liability corporation organized under the laws of Delaware with its principal place of business in West Palm Beach, Florida.

19.     Defendant Ruby Has is a limited liability corporation organized under the laws of New York with its principal place of business in Bay Shore, New York.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendant are residents of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a limited liability corporation whose members are not residents of New York. Defendant is a limited liability corporation whose members are residents of New York.

21.     The Court has personal jurisdiction because Defendant resides within the state of New York and is properly subject to general *in personam* jurisdiction for suits commenced within the state of New York.  Personal jurisdiction is also proper pursuant to CPLR § 302, as this dispute concerns business transacted, in part, within in the state of New York.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**Background of Parties**

23.     Plaintiff Cambridge is a private equity firm based in West Palm Beach, Florida. Cambridge focuses its investments on supply chain-related companies, including businesses in the transportation, distribution, logistics, and supply chain technology industries.

24.     Cambridge's historical investments include companies involved in last-mile logistics technology, such as Bringg, Liftit, and Grand Junction.  It has also invested in notable logistics companies such as XPO Logistics – now an $18 billion leader in diversified supply chain services.  Over the last decade, Cambridge's professionals have invested over $1.5 billion in over 20 companies and have deployed more than $1 billion more in dozens of corporate acquisitions.

25.     To guide its investment strategy and assist its portfolio companies, Cambridge employs professionals with deep experience in logistics, including individuals responsible for building several of the largest companies in the sector.  In this capacity, it is highly sought out not merely for its capital, but also for its operational expertise and strategic guidance.

26.     For example, Essa Al-Saleh is an Operating Partner with Cambridge Capital. Before Cambridge Capital, Al-Saleh was the President and CEO of Agility's Global Integrated

Logistics (GIL). During his time at Agility, Al-Saleh led the transformation of Agility GIL from a 300-person operation in one country into one of the top ten global logistics businesses with over $4 billion in revenue, operating in over 100 countries with more than 18,000 people.

27.     Dave Stubbs is another Operating Partner with Cambridge Capital. Before Cambridge Capital, Stubbs helped to build Kuehne + Nagel, a global logistics powerhouse operating in over 100 countries. As Senior Vice President and General Manager for the Lead Logistics business, he started up and managed a $400 million business for the first global 4PL in the logistics industry.

28.     The Cambridge investment team also has deep experience in logistics. For example, Benjamin Gordon is founder and Managing Partner of Cambridge Capital. Gordon has spent his career investing in and helping to build supply chain and technology companies. Gordon has founded four firms in the supply chain arena. In addition, he has been sought out as an advisor and investor in the sector. He has worked with firms such as XPO, Agility Logistics, UPS, DHL, Kuehne & Nagel, NFI Logistics, GENCO, Echo Global, Dixie, and others.

29.     Defendant Ruby Has is an ecommerce fulfillment company based in in Bay Shore, New York. It operates warehouses in New York, New Jersey, Nevada, California, Kentucky, and Ontario, Canada. Ruby Has stores inventory for its clients in those warehouses and picks, packs, and ships its clients' products as they are ordered online.

30.     Ruby Has was founded in 2011 by Rafael Zakinov. Prior to 2020, the company enjoyed only marginal success and had not generated significant cash flow. For this reason, it had regularly solicited outside investors and repeatedly raised money in the form of equity, convertible notes, and equipment debt from outside lenders. From 2011 until early 2020, the company raised at least $11 million from at least 18 different investors and lenders.

31.     In 2015, Eli and Avrami Mermelstein became 50% owners of Ruby Has through a holding company called Hameah LLC.  This interest was purchased along with interests in several other businesses for a total purchase price of less than $2 million.  Together with Zakinov, the Mermelsteins constitute the primary shareholders in Ruby Has.

**Initial Overtures**

32.     Ruby Has first initiated contact with Cambridge in June of 2018.  The President of Ruby Has, Esther Kestenbaum, reached out to Cambridge via a mutual friend, suggesting that Ruby Has needed a strategic advisor for a potential funding round.  In connection with those initial discussions, Ruby Has provided a pitch deck touting its business.

33.     Cambridge declined to proceed at the time.  But Ruby Has was undeterred and repeatedly followed up, ultimately arranging multiple meetings between Ruby Has principals and Cambridge, in Columbus, Ohio, New York City and Israel.

34.     The conversations continued into 2019.  In a meeting held in New York City on May 21, 2019, Zakinov and Kestenbaum requested that Cambridge make an offer to buy out the Mermelsteins.  They both expressed the point of view that the company would benefit from an investor who knew the logistics industry, had a track record of helping companies like Ruby Has to grow, and could better support their business.  Cambridge agreed to proceed with a preliminary offer on May 23, 2019, but ultimately the parties did not sign a letter of intent.

35.      A few months later, in August of 2019, Zakinov and Kestenbaum again reached out to Cambridge, again hoping to convince Cambridge to buy out the Mermelsteins.  Cambridge again declined, informing Ruby Has that it was not interested in a deal on the terms suggested by the company.

**The Letter of Intent**

36.     In May of 2020, Ruby Has reengaged with Cambridge yet again.  Ruby Has indicated that it truly valued the logistics help Cambridge could provide, was now willing to move forward with a material investment by Cambridge on reasonable terms, and that it had the support of all shareholders, including the Mermelsteins, who would remain involved in the business.

37.     Over the course of May and June of 2020, Ruby Has and Cambridge negotiated a detailed, six-page Letter of Intent (the "LOI").  This LOI set forth the parameters under which the parties expected Cambridge to invest.

38.     In summary, Cambridge would invest $40 million.  $20 million would be used to provide liquidity for existing shareholders.  An additional $20 million would be used as "growth capital" for Ruby Has.  In return, Ruby Has would give Cambridge a 51% fully-diluted ownership interest in the Company in the form of Series A convertible preferred units, which would bear interest and carry a liquidation preference.  In addition, Ruby Has would pay Cambridge $900,000 per year as an annual management fee in exchange for its continued advice and guidance.

39.     This LOI was extremely substantive.  It reflected the parties' agreement on several key issues including (i) the overall size of the investment; (ii)  the amount of the company that Cambridge would receive; (iii) the type of securities that Cambridge would receive; (iv) the management structure of the business going forward; (v) certain protective provisions and special approval rights for Zakinov as CEO; (vi) Cambridge's due diligence process; and (vii) Cambridge's approval process and overall expected timing.

40.     In signing the LOI, both Cambridge and Ruby Has agreed to negotiate in good faith to work out the final legal matters in a definitive purchase agreement.

41.     In addition to defining the economic terms of the deal, the LOI also contained several explicitly binding legal provisions designed to protect Cambridge in connection with pursuing the investment.  In particular the agreement provided as follows:

### *Business in the Ordinary Course*

Until the execution and delivery of the share purchase agreement or such earlier date as negotiations may terminate, the Company will conduct its business only in the normal and ordinary course and in a manner consistent with good business practices.  In such regard, the Company will (i) not engage in any transaction which would have a negative effect on the assets, business, financial condition, operations or prospects of the Company, and (ii) use its best efforts to preserve its business organization intact and to preserve its existing business relationships.

### *Expenses*

The Company shall pay reasonable out-of-pocket fees and expenses of Cambridge Capital required to consummate the Potential Transaction, such as legal, tax, accounting, insurance and travel.

### *Exclusivity Period*

From the date this letter is accepted until the 90th day thereafter, the Company shall not, and shall cause the Company, its officers, directors, employees and other agents not to (i) take any action to solicit or initiate any Investment or Acquisition Proposal (as hereinafter defined), or (ii) continue, initiate or engage in negotiations with, or disclose any non-public information, other than in the ordinary course of business, relating to the Company, or afford access to any other person or entity except Cambridge and its respective representatives.  The term "Investment or Acquisition Proposal" means any offer, proposal or indication of interest with respect to (a) the acquisition of any assets (other than inventory in the ordinary course of business), operations or stock or units of the Company, or (b) a merger, consolidation or other business combination involving the acquisition of any of the assets or stock of the Company.  To the extent anyone at the Company, directly or indirectly, receives any Investment or Acquisition Proposal, the Company will promptly advise such person, by written notice, of the terms of such Investment or Acquisition Proposal and will promptly advise Cambridge, orally and in writing, of all the terms of such Investment or Acquisition Proposal (including, without limitation, the

identity of the person making the Investment or Acquisition Proposal and all economic terms of such Acquisition Proposal) and, if in writing, deliver a copy of such Investment or Acquisition Proposal to Cambridge.

In addition, if Cambridge Capital has completed its core due diligence and is proceeding in good faith toward a closing, then the parties agree to extend the Exclusivity to 120 days.

42. These provisions were essential and Cambridge would never have agreed to move forward without them. In particular, given the off-and-on negotiating history between the parties, Cambridge had no interest in expending substantial out-of-pocket resources on performing diligence on Ruby Has without complete reimbursement.

43. In addition to protecting the financial resources that it was committing to the deal, Cambridge also needed assurance that its highly experienced logistics team was not wasting its time. Cambridge had no interest in learning (or improving) the details of Ruby Has business operations if Ruby Has intended to shop itself elsewhere. Accordingly, it insisted upon an exclusivity period during which Ruby Has could not solicit other investments or have conversations with potential acquirers.

44. This exclusivity period was extended twice, first to October 25, 2020 as reflected in the automatic extension per the LOI and confirmed in an email exchange between counsel for Plaintiffs and Defendants on September 15, 2020, and then until closing by a subsequent agreement between the parties dated October 15, 2020.

45. Ruby Has agreed to all of these provisions and executed the LOI on June 6, 2020.

46. On June 22, 2020, Zakinov, the Mermelsteins, Kestenbaum and Ruby Has general counsel Alan Pollack called Cambridge to request that a new LOI with identical terms be entered into, effective as of June 25, 2020 .

47. Cambridge found the request unusual but ultimately agreed to this request.

**Cambridge Completes Due Diligence and Begins Improving Ruby Has Operations**

48.      Shortly after the LOI was signed, Ruby Has requested that Cambridge move quickly to complete its due diligence.  Cambridge complied with this request, proceeding with approximately twenty due diligence sessions with the Ruby Has management team over the course of June – August of 2020.   In additional to calls with Ruby Has personnel, Cambridge spoke with three of the company's top customers and three of the company's top technology partners during the weeks of July 6 and July 13.  Cambridge also conducted four site visits to Ruby Has facilities in July 2020, Aug 2020 and Oct 2020.

49.      As business diligence progressed, Cambridge also engaged third parties to execute on its responsibilities as outlined in the LOI. These included:

- Hiring third-party accounting firm (Baker Tilly) for financial due diligence (costing Cambridge $73,350)

- Hiring a law firm (Carlton Fields) for legal diligence and definitive documentation drafting (costing Cambridge $215,000)

- Engaging insurance due diligence specialist Commercial Insurance Associates, which spent over 100 man-hours on extensive insurance due diligence and go-forward insurance policy improvement strategy.

- Hiring First Advantage to perform extensive background checks on key personnel (costing Cambridge $6,532)

50.      In addition to completing its due diligence promptly, Cambridge began providing Ruby Has with substantial consulting services and business advice, in response to Ruby Has's requests for help.

51.      In particular, Cambridge recommended that Ruby Has restructure its management team, demoting its CTO and hiring a new CTO to replace him.  As a result of Cambridge's advice on proper accounting, Ruby Has started accruing for freight costs, centralized various

accounting policies, began capturing customer-level and site-level profitability consistently, and also hired additional senior resources in implementation and customer service. Cambridge also helped Ruby Has to create a brand-new technology strategy for Ruby Has, drawing on lessons learned from executives who had built some of the largest and most successful companies in the logistics industry.

52.     Ruby Has asked Cambridge for help, and implemented Cambridge's recommendations immediately. These changes substantially improved the operation of the Ruby Has business and increased the total value of the company.

53.     Ruby Has also contacted Cambridge for advice and expertise regarding how to ensure forgiveness of its PPP loan. Ruby Has's banker, J.P. Morgan Chase, initially would not consent to forgiveness. Cambridge leveraged significant business and personal relationships to escalate the situation. By contacting more senior decision-makers at J.P. Morgan Chase, Cambridge was able to ensure that Ruby Has received full PPP proceeds, saving Ruby Has $2.8 million.

54.     In addition to providing material assistance to Ruby Has, Cambridge also passed on other potential investments in Ruby Has competitors during the exclusivity period.

55.     Specifically, Cambridge had the opportunity to invest in both ShipBob, Inc. ("ShipBob") and ShipMonk, Inc. ("ShipMonk"), both Ruby Has competitors in the online fullfillment space. Cambridge had the opportunity to invest $40 million in ShipBob and $80 million in ShipMonk.

56.     Cambridge informed Ruby Has about passing on these opportunities. While both ShipBob and ShipMonk were stronger companies and potentially better investments, in reliance

upon promises from Ruby Has that it was working diligently toward closing a deal in good faith, Cambridge chose not to pursue these deals.

57.     Ruby has made these promises to move forward in good faith on numerous occasions, including, but not limited to: June 6, 2020, June 22, 2020, September 15, 2020, October 14, 2020, October 15, 2020, November 11, 2020, November 12, 2020, November 13, 2020, November 16, 2020, and December 1, 2020.

58.     Since Cambridge passed on these deals, ShipBob raised $68 million from Softbank, and ShipMonk raised $290 million from Summit Partners.  If Cambridge had invested on the terms offered to it, its investments would have substantially appreciated in value.

**Cambridge and Ruby Has Agree Upon Deal Terms**

59.     By August 2020, Cambridge had concluded its business, operational and third-party due diligence, had the funds committed to Ruby Has, and was on track to complete definitive documentation, closing and funding.

60.     However, Ruby Has missed its working capital and cash balance forecasts meaningfully from what it sent Cambridge in May and what Cambridge used to determine valuation and deal structure.  Because of this, and in order to comply with the Letter of Intent, the parties needed to work out a working capital adjustment to adjust for this discrepancy.  In addition, the final legal documentation of the purchase agreement needed to be completed.

61.     To ensure that all parties understood and agreed on these final terms before undertaking the time and expense of preparing formal transaction documents, Cambridge and Ruby Has negotiated a document memorializing every business and legal term for the investment.  The parties would only move forward if they reached agreement upon all terms so that the final documentation would be a formality.

62. After a month of detailed negotiations, the parties reached agreement and memorialized that agreement in a detailed, four-page Deal Points Memo (the "Deal Points Memo").

63. Ruby Has confirmed its agreement with the Deal Points Memo via its counsel on September 14, 2020.

64. The Deal Points Memo contained all essential terms relating to the investment and no disputed issues were perceived by either party to remain.

65. The Deal Points Memo's final terms included the following:

- $18M cash at close (due to working capital adjustment)

- 40% retained ownership for Zakinov and Hameah LLC.

- $22M growth capital (due to working capital shortfall/adjustment)

- $1M cash left behind on balance sheet before Cambridge invests

- Working capital peg of -$1.6M GAAP (with one-way adjustment for Cambridge if there is a deficiency)

- No extraction of cash or personal expenses through Company between Sept 18th and Closing

- $9.6M max debt balance

- All related party transactions settled on a cashless basis before Closing

- 2 board seats for Zakinov/Hameah, with no board fees

- of the remainder of board seats would be reserved for Cambridge

- Zakinov to approve Ruby Has acquiring a company

- Various customary rights such as registration, ROFR and co-sale

- 12 highly negotiated specifically worded protective provisions for Zakinov/Hameah

- 6.4% option pool post-money

- Cambridge controls all governance decisions besides the 12 highly negotiated specifically worded protective provisions

- Rep and warranty insurance will be put in place instead of normal escrow, with 100% of premium paid by Sellers and retention paid 50% by Sellers and 50% by Company.

66. With this final agreement in place, Cambridge expected that the formal transaction documents could be quickly drafted and executed.

**Ruby Has Delays Executing the Transaction Documents**

67. Unfortunately, Ruby Has had other plans. After agreeing upon final terms, Ruby Has soon asked Cambridge to accommodate an insurance arrangement that would allow its owners to avoid paying capital gains taxes.

68. Although highly unorthodox, time-consuming and structurally complex – with risks to the future marketability of the business to other buyers in the future – Cambridge decided to allow this as a good faith concession to Ruby Has.

69. To carry out its structuring, Ruby Has interviewed several sets of tax attorneys and professionals. It took the company approximately three months, from August through November, to be able to document to Cambridge and its attorneys exactly what it wanted to do, and how it would change the final deal documents.

70. As soon as Cambridge was able to receive a visualization of the structure, verify its legality, and answer its specific questions on governance, Cambridge approved the unorthodox transaction and asked its counsel to change the legal documentation to reflect Ruby Has's requests.

**Ruby Has Agrees to Sign the Transaction Documents in Exchange for $2 Million**

71.     Even after Cambridge agreed to the tax structuring requested by Ruby Has, the company continued to make additional demands.

72.     In particular, Ruby Has sought to renegotiate the agreed-upon LOI and Deal Points Memo.  In late November, Ruby Has declared that it was seeking an additional $2 million in cash at closing, board fees for existing shareholders, and the ability for existing shareholders to pull cash out of the business (and saddle Ruby Has with extra debt) right before the closing.

73.     Cambridge pushed back, noting that the parties had already agreed to all material terms and that it was inappropriate for Ruby Has to demand additional compensation to close a deal that it had already struck.

74.     From November 29, 2020 through December 1, 2020, Cambridge and Ruby Has engaged in extensive multi-hour discussions concerning these last-minute demands.  These heated discussions came to a head on December 1, 2020.

75.     On December 1, 2020 Eli Mermelstein, speaking on behalf of Ruby Has, said to Ben Gordon "if you agree to $20M cash at close and no working capital adjustment, we will drop everything else."

76.     This request constituted an additional $2 million of cash at closing, all of which would be paid to Ruby Has's existing shareholders. It also meant jettisoning the accounting review of Ruby Has, to determine whether Ruby Has was operating in compliance with the LOI and GAAP accounting principles.

77.     In the interest of closing the deal, Cambridge agreed to this final Ruby Has demand and accepted the terms of this proposed oral agreement.  Cambridge instructed Ruby Has to sign the final transactions documents on these terms and deliver them to Cambridge.

**Ruby Has Reneges On Its Agreement And Refuses to Pay Expenses**

78.     Unfortunately, even this last-minute shakedown did not satisfy Ruby Has.

79.     On December 2, ShipMonk, Inc. ("ShipMonk"), a direct competitor of Ruby Has, announced that it had raised $290 million in funding from Summit Partners, another private equity fund. This capital raise reflected ShipMonk's position as a larger and faster-growing company within the ecommerce fulfillment space.

80.     Ruby Has was itself no stranger to Summit Partners. In direct violation of its obligations under the LOI, Ruby Has had engaged in secret discussions with Summit Partners concerning a potential investment during the LOI's exclusivity period.

81.     Zakinov subsequently admitted, during in-person conversations with Cambridge Principal Matthew Smalley, that these discussions between Ruby Has and Summit Partners had previously taken place. Indeed, Zakinov confirmed that the conversations with Summit Partners had focused exclusively on Ruby Has, and that Summit Partners seemed very interested in the business. Zakinov told Smalley about these discussions during a tour of the Ruby Has warehouses in Nevada.

82.     In connection with these discussions with Summit Partners, Ruby Has had also provided confidential business information to Summit Partners, hoping to entice the company into making a competing offer for its business that it could either accept or use to "bid up" Cambridge.

83.     On information and belief, Summit Partners knew about the LOI and subsequent Deal Points Memo between Ruby Has and Cambridge, and used improper means to interfere in that contractual relationship and induce Ruby Has to breach its contractual responsibilities.

84.     On at least one occasion shortly after the deal between Summit Partners and ShipMonk was announced, Ruby Has also contacted ShipMonk.  In an additional violation of its duties under the LOI's exclusivity period, it directly solicited an acquisition by ShipMonk, provided ShipMonk with confidential business information, and sought to bid ShipMonk against Cambridge.

85.     On information and belief, ShipMonk knew about the LOI and subsequent Deal Points Memo between Ruby Has and Cambridge and used improper means to interfere in that contractual relationship and induce Ruby Has to breach its contractual responsibilities.

86.     Ruby Has also spoke to a company that claimed to have bid $600 million for ShipMonk.  In those conversations, Ruby Has attempted to convince that company to make an investment in its business instead.

87.     On information and belief Ruby Has committed numerous other violations of its exclusivity obligations as well.

88.     On December 9, Ruby Has told Cambridge that unless Cambridge would increase its valuation for the purposes of the Cambridge investment to $240 million, Ruby Has would renege on the deal.  This represented a more than fourfold increase on the previously agreed-upon valuation and would, in essence, require Cambridge to pay more than four times the agreed-upon price.  Indeed, Ruby Has had accepted a $58 million valuation just six months earlier when negotiating the LOI.

89.     When Cambridge balked at this flagrant breach of the agreement, Ruby Has then said that if Cambridge refused, it would simply go hire an investment banker in two months, run an auction process, and find another buyer that would pay more.

90.     Since it was now obvious that Ruby Has had reneged on the deal, Cambridge

promptly sent an invoice for the $405,124.03 in third-party expense reimbursement it was owed.

The executed LOI called for those fees and expenses to be paid by Ruby Has.

91.     Ruby Has responded, through Eli Mermelstein, by refusing to pay these legitimate

expenses.

92.     With no other options, Cambridge has no choice but to bring suit against Ruby

Has to vindicate its rights.

**<u>CAUSES OF ACTION</u>**

**<u>COUNT ONE</u>**
**BREACH OF CONTRACT**
**(Breach of Letter of Intent)**

93.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

94.     On June 25, 2020, Defendant executed a Letter of Intent (the "LOI") with

Plaintiff.

95.     The LOI is a valid and binding contract.

96.     Pursuant to the LOI Plaintiff agreed to make an offer to purchase 51% of

Defendant for $40 million pursuant to certain diligence and approvals and to proceed with the

drafting of a formal share purchase agreement and collateral documents.

97.     In return Defendant agreed, *inter alia*, that "From the date this letter is accepted

until the 90th day thereafter, the Company shall not, and shall cause the Company, its officers,

directors, employees and other agents not to (i) take any action to solicit or initiate any

Investment or Acquisition Proposal (as hereinafter defined), or (ii) continue, initiate or engage in

negotiations with, or disclose any non-public information, other than in the ordinary course of

20

business, relating to the Company, or afford access to any other person or entity except Cambridge and its respective representatives."

98.     This exclusivity period was extended twice, first to October 25, 2020 as reflected in the automatic provision in the LOI as well as an email exchange between counsel for Plaintiffs and Defendants on September 15, 2020, and then until closing by a subsequent agreement between the parties dated October 15, 2020.

99.     In the LOI, Defendant also agreed to "pay reasonable out-of-pocket fees and expenses of Cambridge Capital required to consummate the Potential Transaction."

100.    Plaintiff fulfilled its obligations under the contract.

101.    In reliance upon Defendant's promises, Plaintiff incurred over $405,000 in out-of-pocket expenses in connection with consummating the Potential Transaction.

102.    Defendant breached its obligations under the contract by:

- Engaging in secret discussions with Summit Partners concerning a potential acquisition and/or investment in Defendant;

- Providing Summit Partners with confidential non-public information concerning Defendant for the purpose of soliciting such investment;

- Engaging in secret discussions with ShipMonk concerning a potential acquisition and/or investment in Defendant;

- Providing ShipMonk with confidential non-public information concerning Defendant for the purpose of soliciting such investment

- Engaging in discussions with another buyer, whose identity is unknown but was represented to have offered $600 million for a competitor to Defendant, concerning an acquisition and/or investment in Defendant.

- Failing to repay Plaintiff' out of pocket expenses;

103.    Defendant's breaches are material.

104.     Defendant's breaches are willful, wanton, and intentional.

105.     Defendant's breaches have caused damage to Plaintiff.

106.     Accordingly, the Court should award damages against Defendant for breach of contract in an amount to be proven at trial.

## COUNT TWO
### BREACH OF CONTRACT
### (Breach of Duty to Negotiate in Good Faith)

107.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

108.     On June 25, 2020, Defendant executed a Letter of Intent (the "LOI") with Plaintiff.

109.     The LOI is a valid and binding contract.

110.     While final legal terms remained to be documented, in drafting the LOI the parties had reached agreement on several key issues including (i) the overall size of the investment; (ii)  the amount of the company that Cambridge would receive; (iii) the type of securities that Cambridge would receive; (iv) the management structure of the business going forward; (v) certain protective provisions and special approval rights for Zakinov as CEO; (vi) Cambridge's due diligence process; and (vii) Cambridge's approval process and overall expected timing.

111.     In signing the LOI, both Cambridge and Ruby Has agreed to negotiate in good faith to work out the terms remaining open.

112.     Defendant breached its obligations under the contract by:

- Engaging in secret discussions with Summit Partners concerning a potential acquisition and/or investment in Defendant;

- Providing Summit Partners with confidential non-public information concerning Defendant for the purpose of soliciting such investment;

- Demanding new economic terms inconsistent with the provisions previously agreed-to in the LOI;

- Engaging in secret discussions with ShipMonk concerning a potential acquisition and/or investment in Defendant;

- Providing ShipMonk with confidential non-public information concerning Defendant for the purpose of soliciting such investment;

- Engaging in discussions with another buyer, whose identity is unknown but was represented to have offered $600 million for a competitor to Defendant, concerning an acquisition and/or investment in Defendant;

- Failing to negotiate in good faith;

- Abandoning negotiations in December of 2020.

113.    Defendant's breaches are material.

114.    Defendant's breaches are willful, wanton, and intentional.

115.    Defendant's breaches have caused damage to Plaintiff.

116.    Accordingly, the Court should award damages against Defendant for breach of contract in an amount to be proven at trial.

**COUNT THREE**
**BREACH OF CONTRACT**
**(Breach of September 14, 2020 Deal Points Memo)**

117.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

118.    On September 14, 2020, Defendant, through its counsel, agreed to a final set of written terms by which Plaintiff would make a $40 million investment in Defendant.

119.    The terms of the investment were itemized in a written document (the "Deal Points Memo") drafted and negotiated by both parties.

120.    The Deal Points Memo contained all essential terms relating to the investment and no disputed issues were perceived by either party to remain.

121.    Both Plaintiff and Defendant agreed that the terms itemized in the Deal Points Memo would serve as the basis for a subsequent execution contract that both parties would sign simply to observe formalities and that neither party would unreasonably refuse to sign that subsequent instrument.

122.    The Deal Points Memo is a valid and binding contract.

123.    Plaintiff fulfilled its obligations under the Deal Points Memo.

124.    Defendant breached its obligations under the Deal Points Memo by refusing to sign the subsequent execution contract, despite that contract including all terms and language requested by Defendant.

125.    Defendant breached its obligations under the Deal Points Memo by refusing to honor its terms and proceed with the investment.

126.    Defendant breached its obligations under the Deal Points Memo by failing to negotiate in good faith.

127.    Defendant's breaches are willful, wanton, and intentional.

128.    Defendant's breaches have caused damage to Plaintiff.

129.    Accordingly, the Court should award damages against Defendant for breach of contract in an amount to be proven at trial.

## COUNT FOUR
## BREACH OF CONTRACT
### (Breach of December 1, 2020 Agreement to Close)

130.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

131.    On December 1, 2020, Eli Mermelstein, acting on behalf of Defendant, promised to immediately sign execution copies of the investment documents in exchange for an additional $2 million of cash at closing to be delivered to the sellers.

132.    Ben Gordon, acting on behalf of Plaintiff, agreed to Mermelstein's terms and accepted his oral offer to sign on behalf of Defendant.

133.    Defendant's accepted proposal is a valid and binding oral contract.

134.    Plaintiff fulfilled its obligations under the oral contract.

135.    Defendant breached the oral contract by refusing to close the transaction and sign the execution copies of the investment documents.

136.    Defendant's breaches are material.

137.    Defendant's breaches are willful, wanton, and intentional.

138.    Defendant's breaches have caused damage to Plaintiff.

139.    Accordingly, the Court should award damages against Defendant for breach of contract in an amount to be proven at trial.

## COUNT FIVE
## BREACH OF CONTRACT
### (Breach of Good Faith and Fair Dealing)

140.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

141.     Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.  This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  The duties of good faith and fair dealing imply obligations which encompass any promises which a reasonable person in the position of promise would be justified in understanding were included.

142.     On June 25, 2020, September 14, 2020, and December 1, 2020, Plaintiff entered valid and binding contracts with Defendant.

143.     Defendant owed Plaintiff a duty to act in good faith and conduct fair dealing.

144.     Defendant failed to exercise good faith and fair dealing in fulfilling the terms and promises of the June 25, 2020, September 14, 2020, and December 1, 2020 contracts.

145.     Defendant's breaches are material.

146.     Defendant's breaches are willful, wanton, and intentional.

147.     Defendant's breaches have caused damage to Plaintiff.

148.     Accordingly, the Court should award damages against Defendant for breach of contract in an amount to be proven at trial.

## COUNT SIX
## PROMISSORY ESTOPPEL

149.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

150.     On numerous occasions, Defendant promised that it would act in good faith to consummate a transaction by which Plaintiff would invest $40 million in exchange for a 51% stake in Defendant.

151.     These promises were made on numerous occasions, including, but not limited to:

- June 6, 2020;
- June 22, 2020;
- September 15, 2020;
- October 14, 2020;
- October 15, 2020;
- November 11, 2020;
- November 12, 2020;
- November 13, 2020;
- November 16, 2020;
- December 1, 2020.

152.     In reliance on these clear and unambiguous promises Plaintiff provided substantial services to Defendant including:

- Restructuring Defendant's management team, including demotion of its existing CTO and the hiring of a replacement;

- Centralizing Defendant's accounting practices;

- Advising Defendant on how to properly accrue for freight costs;

- Advising Defendant on how to properly capture customer-level and site-level profitability;

- Providing Defendant with a new technology strategy;

- Introducing Defendant to numerous potential customers;

- Identifying potential acquisition targets for Defendant.

153.     In reliance on these clear and unambiguous promises, Plaintiff passed on several lucrative investments in similar ventures.

154.    In particular, in reliance upon Defendant's promises, Plaintiff passed on the opportunity to invest in ShipBob and ShipMonk, two other logistics companies in which it was invited to invest on favorable terms.

155.    Defendant knew that Plaintiff was relying upon these clear and unambiguous promises to its detriment and intended for it to rely upon these promises.

156.    Defendant breached its promises to act in good faith to consummate a transaction by which Plaintiff would invest $40 million in exchange for a 51% stake in Defendant.

157.    Defendant has been damaged by its reliance upon Plaintiff's promises.

158.    The Court should order damages against Defendant for promissory estoppel in an amount to be determined at trial.

## COUNT SEVEN
## UNJUST ENRICHMENT

159.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

160.    Plaintiff performed services for Defendant, including, but not limited to:

- Restructuring Defendant's management team, including demotion of its existing CTO and the hiring of a replacement;

- Centralizing Defendant's accounting practices;

- Advising Defendant on how to properly accrue for freight costs;

- Advising Defendant on how to properly capture customer-level and site-level profitability;

- Providing Defendant with a new technology strategy;

- Introducing Defendant to numerous potential customers;

- Identifying potential acquisition targets for Defendant.

161.    Defendant was enriched by the work performed by Plaintiff.

162.     Defendant was enriched at the expense of Plaintiff.

163.     It is against equity and good conscience to allow Defendant to retain the value of the work performed by Plaintiff.

164.     Plaintiff has suffered damages as a result of Defendants' conduct.

165.     Accordingly, the Court should award damages against Defendants for unjust enrichment in an amount to be proven at trial.

## COUNT EIGHT
## QUANTUM MERUIT

166.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

167.     Plaintiff performed services for Defendant, including, but not limited to:

- Restructuring Defendant's management team, including demotion of its existing CTO and the hiring of a replacement;

- Centralizing Defendant's accounting practices;

- Advising Defendant on how to properly accrue for freight costs;

- Advising Defendant on how to properly capture customer-level and site-level profitability;

- Providing Defendant with a new technology strategy;

- Introducing Defendant to numerous potential customers;

- Identifying potential acquisition targets for Defendant.

168.     Plaintiff performed these services in good faith.

169.     Defendant accepted these services from Plaintiff.

170.     Plaintiff had a reasonable expectation of compensation for the services that it provided.

171.     Plaintiff has suffered damages as a result of Defendant's conduct.

172.    Accordingly, the Court should award damages against Defendant for quantum meruit in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A.    Award nominal, compensatory, and punitive damages in an amount to be determined at trial but not less than:

- Plaintiff's out-of-pocket expenses of not less than $405,124.03.

- Plaintiff's lost management fees from Ruby Has of not less than $900,000 per year.

- Plaintiff's lost management fees from its limited partners of not less than $800,000 per year.

- Plaintiff's lost profits relating to the Ruby Has investment in an amount to be determined at trial but reflecting a multiple of the contemplated $40 million investment.

- Plaintiff's lost profits relating to the ShipBob investment in an amount to be determined at trial but reflecting a multiple of the contemplated $40 million investment.

- Plaintiff's lost profits relating to the ShipMonk investment in an amount to be determined at trial but reflecting a multiple of the contemplated $80 million investment.

- The reasonable value of the consulting and business optimization services rendered to Ruby Has.

- Any and all increase in the enterprise value of Ruby Has that resulted from Cambridge's consulting and business optimization services.

B.    Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

C.    Award any additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by Jury.

**DATED:**     New York, New York
December 31, 2020

> MANDEL BHANDARI LLP
> 80 Pine Street, 33rd Floor
> New York, New York 10005
> (212) 269-5600
>
> By:    /s/ Rishi Bhandari
> Rishi Bhandari
>
> *Attorneys for Plaintiff Cambridge Capital LLC*