UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/30/2021
```

-----------------------------------------------------------------------X
:
CAMBRIDGE CAPITAL LLC,                                                  :
:
Plaintiff,                            :
:                    20-cv-11118 (LJL)
-v-                                         :
:                    OPINION AND ORDER
RUBY HAS LLC,                                                          :
:
Defendant.                             :
:
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant/Counterclaim Plaintiff Ruby Has LLC ("Ruby Has") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(6), for an order dismissing Counts Two to Eight of the

complaint and limiting the scope of Count One. Dkt. No. 10. Plaintiff/Counterclaim Defendant

Cambridge Capital LLC ("Cambridge Capital") moves, also pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss the counterclaims filed against it. Dkt. No. 45.

For the following reasons, Ruby Has's motion to dismiss is granted in part and denied in

part, and Cambridge Capital's motion to dismiss is granted in part and denied in part.

## BACKGROUND

On Ruby Has's motion to dismiss, the Court accepts as true the allegations of the

complaint, Dkt. No. 1 ("Complaint" or "Compl."), and the documents incorporated by reference.

On Cambridge Capital's motion to dismiss, the Court accepts as true the allegations of the

amended counterclaims, Dkt. No. 41 ("Amended Counterclaims" or "Am. Countercl."), and the

documents incorporated by reference.

I.     **The Complaint**

A.     **The Parties**

This case arises out of a failed deal.  Cambridge Capital is a private equity firm that

invests in supply chain companies, including businesses in the transportation, distribution,

logistics, and supply chain technologies industries.  Compl. ¶¶ 3, 23.  Ruby Has is an ecommerce

fulfillment company.  *Id.* ¶¶ 2, 29.  It was founded in 2011 and operates warehouses in the

United States and Canada.  *Id.* ¶ 2.  Ruby Has stores inventory for its clients in those warehouses

and picks, packs, and ships its clients' products as they are ordered online.  *Id.* ¶ 29.  According

to the Complaint, prior to 2020, the company enjoyed only marginal success and had not

generated significant cash flow.  *Id.* ¶ 30.  For this reason, it regularly solicited outside investors

and repeatedly raised money in the form of equity, convertible notes, and equipment debt from

outside lenders.  *Id.*

B.     **The Letter of Intent**

Cambridge Capital was one of the firms Ruby Has solicited for an investment.[1]  On June

6, 2020, Cambridge Capital and Ruby Has executed a six-page Letter of Intent ("LOI") for

Cambridge Capital to invest in Ruby Has in exchange for a majority interest in the company.  *Id.*

¶¶ 4, 5, 45.  The operative LOI with identical terms was re-executed effective June 25, 2020.  *Id.*

¶¶ 4, 5, 46.  The LOI is incorporated by reference to the Complaint.  Because its terms are

critical to the pending motions, the Court describes them at length and in detail.

The LOI set forth the parameters for Cambridge Capital to invest $40 million in Ruby

Has in exchange for a 51% fully-diluted ownership interest in the company in the form of Series

---

[1] The Complaint alleges that "[b]eginning in 2018, executives from Ruby Has repeatedly reached out to Cambridge [Capital] concerning a potential investment in their business" and that Cambridge Capital initially declined to proceed before agreeing in June 2020 to move forward with a potential investment.  *Id.* ¶ 4; *see also id.* ¶¶ 32-35.

A convertible preferred units, which would bear interest and carry a liquidation preference. *Id.*
¶¶ 37-38.  Of the total investment, $20 million would provide liquidity for existing shareholders
while the remaining $20 million would be used as "growth capital" for Ruby Has. *Id.*
Cambridge Capital would also provide continued advice and guidance to Ruby Has in exchange
for an annual management fee of $900,000 per year. *Id.*

The LOI, on Cambridge Capital letterhead, stated that Cambridge Capital was "pleased to
submit a preliminary, non-binding Letter of Intent for a transaction to provide growth capital and
liquidity to the Company and its shareholders."  Dkt. No. 12-1 ("LOI") at 1.  It described
Cambridge Capital's proposal as being "subject to the following due diligence process," which it
then described in detail. *Id.* at 3.  It stated that Cambridge Capital "anticipated" that it "will
complete the due diligence requirements outlined above within 90 days of the execution of th[e]
Letter of Intent" and that it was Cambridge Capital's "intent to move forward to a closing as
quickly as possible, without sacrificing the need to do the work properly." *Id.*  It added:  "Final
approval from the Investment Committee of Cambridge Capital will be required prior to
completing the Potential Transaction." *Id.* at 4.

The LOI also contained several relevant provisions under a section entitled "Other
Considerations." *Id.* at 4-5.  The LOI contained an ordinary course covenant on the part of Ruby
Has providing:

> **Business in the Ordinary Course**
>
> Until the execution and delivery of the share purchase agreement or such earlier
> date as negotiations may terminate, the Company will conduct its business only in
> the normal and ordinary course and in a manner consistent with good business
> practices. In such regard, the Company will (i) not engage in any transaction which
> would have a negative effect on the assets, business, financial condition, operations
> or prospects of the Company, and (ii) use its best efforts to preserve its business
> organization intact and to preserve its existing business relationships.

*Id.* at 4.

The LOI also provided the following with respect to expenses:

***Expenses***

The Company shall pay reasonable out-of-pocket fees and expenses of Cambridge Capital required to consummate the Potential Transaction, such as legal, tax, accounting, insurance and travel.

*Id.*

The LOI also contained a 90-day Exclusivity Period:

***Exclusivity Period***

From the date this letter is accepted until the 90th day thereafter, the Company shall not, and shall cause the Company, its officers, directors, employees and other agents not to (i) take any action to solicit or initiate any Investment or Acquisition Proposal (as hereinafter defined), or (ii) continue, initiate or engage in negotiations with, or disclose any nonpublic information, other than in the ordinary course of business, relating to the Company, or afford access to any other person or entity except Cambridge and its respective representatives. The term "Investment or Acquisition Proposal" means any offer, proposal or indication of interest with respect to (a) the acquisition of any assets (other than inventory in the ordinary course of business), operations or stock or units of the Company, or (b) a merger, consolidation or other business combination involving the acquisition of any of the assets or stock of the Company. To the extent anyone at the Company, directly or indirectly, receives any Investment or Acquisition Proposal, the Company will promptly advise such person, by written notice, of the terms of such Investment or Acquisition Proposal and will promptly advise Cambridge, orally and in writing, of all the terms of such Investment or Acquisition Proposal (including, without limitation, the identity of the person making the Investment or Acquisition Proposal and all economic terms of such Acquisition Proposal) and, if in writing, deliver a copy of such Investment or Acquisition Proposal to Cambridge.

In addition, if Cambridge Capital has completed its core due diligence and is proceeding in good faith toward a closing, then the parties agree to extend the Exclusivity to 120 days.

*Id.* The LOI's Exclusivity Period was extended on October 25, 2020 as reflected in the automatic extension in the LOI and confirmed in an email exchange between counsel for Cambridge Capital and Ruby Has on September 15, 2020. Compl. ¶ 44. Cambridge Capital alleges it was extended a second time "until closing by a subsequent agreement between the parties dated October 15, 2020." *Id.* Another part of the Complaint states that the Exclusivity

Period ran through October 25, 2020 "and was subsequently extended through December of

2020." *Id.* ¶ 7.

There was also a provision on governing law:

**Governing Law**

This Letter of Intent, and any non-contractual obligations arising out of or in connection with it, shall be governed by and constructed in accordance with the laws of the state of Delaware.  Likewise, the Definitive Agreement shall be governed by and construed in accordance with Delaware law.

LOI at 5.

Lastly, a section entitled "Non-Binding Agreement" stated as follows:

**Non-Binding Agreement**

This letter is not intended to be a binding contract (other than with respect to the section herein titled *Exclusivity Period*), and the parties understand that no obligation exists on behalf of either Cambridge to pay the Purchase Price or on behalf of the Company to sell the units prior to entering into the share purchase agreement. This letter is an expression of mutual intent to proceed with the drafting of the share purchase agreement and collateral documents contemplated hereby in accordance with the principles stated herein.

We are highly enthusiastic about the prospect of finalizing a transaction together, and we are confident that our proposal will result in an outcome that benefits the Company, its shareholders, its employees and its customers.  We stand by to provide any clarification or answer any questions regarding our proposal.

*Id.*  The LOI was signed by Benjamin Gordon as managing partner of Cambridge Capital and by

Rafael Zakinov as CEO of Ruby Has.  *Id.* at 6.

### C.    Due Diligence and Negotiation of Final Transaction Documents

Cambridge Capital conducted approximately twenty due diligence sessions with the Ruby

Has management team from June to August 2020, spoke to three of Ruby Has's top customers

and three of its top technology partners, and conducted four site visits to Ruby Has facilities in

July, August, and October 2020.  Compl. ¶ 48.  Cambridge Capital also hired a third-party

accounting firm to conduct financial due diligence, a law firm for legal diligence and definitive

documentation drafting, an insurance due diligence specialist to conduct insurance due diligence and advise on a go-forward insurance policy improvement, and an investigative firm to perform background checks on key personnel. *Id.* ¶ 49. Cambridge Capital responded to Ruby Has's requests for advice by providing consulting services, including on the restructuring of its management team, the replacement of its Chief Technology Officer, its accounting policies, and its technology strategy. *Id.* ¶¶ 50-51. It assisted Ruby Has with a request for forgiveness of Ruby Has's PPP loan, allegedly saving Ruby Has $2.8 million.[2] *Id.* ¶ 53. Cambridge Capital alleges that it worked in good faith to perform due diligence, draft the necessary legal documents, and finalize all of the specific terms of the deal, and that it provided substantial advice and assistance to Ruby Has after the execution of the LOI. *Id.* ¶ 7.

By August 2020, Cambridge Capital had concluded its business, operational, and third-party due diligence, had the funds committed to Ruby Has, and was on track to complete definitive documentation, closing, and funding. *Id.* ¶ 59. Ruby Has, however, missed its working capital and cash balance forecasts meaningfully from what it had sent to Cambridge Capital in May and from what Cambridge Capital used to determine valuation and deal structure. *Id.* ¶ 60. As a result, the parties negotiated a working capital adjustment for the discrepancy. *Id.*

The parties negotiated a four-page Deal Points Memo, and on September 14, 2020, Ruby Has confirmed its agreement with the Deal Points Memo, which reflected that the parties had agreed on a final set of terms for the investment. *Id.* ¶¶ 9, 62-65. Ruby Has promised that it

---

[2] PPP is not defined in the Complaint but likely refers to the federal Paycheck Protection Program, which was created by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286-94 (2020) (codified at 15 U.S.C. § 636(a)). PPP authorized the Small Business Administration to guarantee loans to certain businesses affected by the COVID-19 pandemic.

would execute a formal set of deal documents memorializing the terms reflected in the Deal Points Memo once drafted by counsel.  *Id.* ¶ 9.

### D.  Ruby Has Allegedly Delays Executing the Transaction Documents

Final transaction documents were not signed by Ruby Has.  Ruby Has delayed executing the final deal documents until it could draw up what Cambridge Capital characterizes as "a highly unorthodox, time-consuming, and structurally complex insurance arrangement that [Ruby Has] believed would allow it to avoid taxes on the deal," which would have generated "close to $20 million in capital gains."  *Id.* ¶ 10; *see also id.* ¶¶ 67-70.  Cambridge Capital agreed to accommodate this structure, but Ruby Has's "demand dragged out the deal for several months and prevented the parties from executing the transaction in September, as Ruby Has had initially promised."  *Id.* ¶ 10.

Then, Cambridge Capital alleges, after this tax planning was in place, Ruby Has demanded additional cash from Cambridge Capital while seeking to disperse as much of the existing Ruby Has assets to existing owners as possible before the deal closed.  *Id.* ¶ 11.  In particular, in late November, Ruby Has sought to renegotiate the agreed-upon LOI and Deal Points Memo, declaring that it was seeking an additional $2 million in cash at closing, board fees for existing shareholders, and the ability for existing shareholders to pull cash out of the business right before the closing.  *Id.* ¶ 72.  The parties engaged in extensive multi-hour discussions culminating in a "heated discussion on December 1, 2020," during which Ruby Has asked Cambridge Capital to pay it an additional $2 million in cash at closing.  *Id.* ¶ 12; *see also id.* ¶¶ 74-77.  Cambridge Capital agreed in exchange for Ruby Has's agreement to sign the deal documents immediately.  *Id.* ¶¶ 12, 77.

E.     **The ShipMonk Transaction, Ruby Has's Alleged Violations of the Exclusivity Period, and the Deal Falls Apart**

The following day, December 2, 2020, Summit Partners, another private equity fund, announced that it had made a $290 million investment in a direct competitor to Ruby Has, an ecommerce fulfillment company called ShipMonk, Inc. ("ShipMonk"). *Id.* ¶¶ 14, 79. Shortly after, on at least one occasion, Ruby Has contacted ShipMonk and—in violation of Ruby Has's duties under the second extended Exclusivity Period—directly solicited an acquisition by ShipMonk, provided ShipMonk with confidential business information, and sought to bid ShipMonk against Cambridge Capital. *Id.* ¶ 14, 84.

Cambridge Capital also alleges that, during the Exclusivity Period, Ruby Has had engaged in secret discussions with Summit Partners concerning a potential investment. *Id.* ¶¶ 13, 80-81. Ruby Has allegedly provided confidential business information to Summit Partners, "hoping to entice the company into making a competing offer for its business that it could either accept or use to 'bid up' Cambridge [Capital]." *Id.* ¶ 82. Additionally, Cambridge Capital alleges that, at some unspecified time, "Ruby Has also spoke to a company that claimed to have bid $600 million for ShipMonk" and "attempted to convince that company to make an investment in its business instead." *Id.* ¶ 86. It also alleges "on information and belief" that there were "numerous" unspecified "other violations" of the exclusivity provision. *Id.* ¶ 87.

During the Exclusivity Period, Cambridge Capital allegedly passed on potential investments in Ruby Has's competitors. *Id.* ¶¶ 8, 54. Specifically, it forewent opportunities to invest $40 million in ShipBob, Inc. ("ShipBob"), another competitor to Ruby Has, and to invest $80 million in ShipMonk and told Ruby Has about these foregone opportunities. *Id.* ¶¶ 54-56. In passing on these opportunities, Cambridge Capital relied on promises that Ruby Has was working diligently to closing a deal in good faith. *Id.* ¶ 56. Ruby Has also allegedly made

promises to move forward in good faith on numerous occasions between June 6, 2020 and December 1, 2021.  *Id.* ¶ 57.

On December 9, 2020, which was a week after the ShipMonk transaction was announced, Ruby Has told Cambridge Capital that unless Cambridge Capital would increase its valuation of Ruby Has to $240 million (a more than fourfold increase on a previous valuation), it would renege on the deal.  *Id.* ¶¶ 14, 88.  Cambridge Capital refused to engage in such a bidding war. Ruby Has then informed Cambridge Capital that it would not sign the final transaction documents, claiming it would hire an investment banker in two months, run an auction process, and find another buyer who would pay more.  *Id.* ¶¶ 15, 89.  Ruby Has also refused to pay for Cambridge Capital's out-of-pocket expenses of $405,124.03 in connection with the diligence process.  *Id.* ¶¶ 15, 90-91.

## II.    The Counterclaims

In response to Cambridge's Complaint, Ruby Has brought counterclaims against Cambridge Capital and its principals, Benjamin Gordon ("Gordon") and Matthew Smalley ("Smalley") (collectively "Counterclaim Defendants").  Ruby Has's Amended Counterclaims characterize the events alleged in Cambridge Capital's Complaint differently and include additional allegations.  These allegations are taken as true for the purpose of Cambridge Capital's motion to dismiss.

In Ruby Has's version of events, Cambridge Capital induced it to engage in negotiations, to sign the LOI, and to agree to an initial extension of the Exclusivity Period on false promises about Cambridge Capital's partners, investment process, and stability.  Am. Countercl. ¶ 2. Cambridge Capital then extended the negotiations in "endless efforts" to starve Ruby Has at a time when it was in need of capital and "to retrade the terms of the deal in a manner that benefitted Cambridge [Capital] at the expense of Ruby Has and its owners."  *Id.*  Ruby Has

pulled out of the deal—which was non-binding in any event—because "as the months

progressed, Ruby Has had reason to doubt that Cambridge [Capital] had the ability and contacts

to bring value to Ruby Has as they had claimed, and that would justify the enormous

management fee to Cambridge [Capital] that they demanded." *Id.*  According to Ruby Has,

Cambridge Capital and its principals "not only cost Ruby Has hundreds of thousands of dollars

of expenses and months of effort at a critical time in its business, but damaged Ruby Has in an

amount no less than $20 million by interfering with Ruby Has's ability to proceed with multiple

other potential investors that approached Ruby Has, and continues to interfere via this lawsuit

with Ruby Has's stated intention to seek an alternative investor." *Id.* ¶ 4.

    **A.**    **Ruby Has's Version of Events**

Ruby Has is "a highly successful mid-sized company," *id.* ¶ 2, and "a leader in the third-

party logistics industry," *id.* ¶ 5.  Discussions between Ruby Has and Cambridge Capital began

as early as 2018, were restarted in 2019, stopped after Ruby Has rejected an offer from

Cambridge Capital, and then commenced again in 2020.  *Id.* ¶¶ 12-16.  Ruby Has "was open to a

possible investment at this time given the on-going Covid-19 pandemic" and "needed capital in

order to deploy additional capacity for the fourth quarter of 2020, due to the anticipated

ecommerce fulfillment needs during the holiday season."  *Id.* 17.

On or about June 25, 2020, Ruby Has signed a Letter of Intent ("LOI") with Cambridge

Capital for an investment in Ruby Has; the LOI is characterized as preliminary, non-binding, and

only creating legal obligations with respect to the Exclusivity Period.  *Id.* ¶¶ 27-32; Dkt. No.

41-2.  More than six weeks later, on August 11, 2020, Cambridge Capital sent Ruby Has a

document entitled "Legal Documentation Principles and Important Remaining Deal Points" that

"seemed to change even the few high level terms in the LOI."  *Id.* ¶¶ 33-34.  As a result of these

changes, Ruby Has had to engage outside counsel and engage in rounds of negotiations of deal

10

terms that delayed the negotiation and preparation of the sale agreement and other deal documentation.  *Id.* ¶¶ 34-36.

In September 2020, the parties exchanged drafts of a document called "Deal Points," but that document was never finalized or signed.  *Id.* ¶ 37.  The Deal Points memorandum was followed by discussions between the parties during which, among other things, Cambridge Capital "improperly pressed Ruby Has to reduce the purchase price by $2 million, claiming it was appropriate as a working capital adjustment, when it was not."  *Id.* ¶ 38.  On or about September 15, 2020, after Cambridge Capital demanded that the Exclusivity Period be extended, Ruby Has agreed to an initial extension of the LOI's Exclusivity Period, which had been scheduled to expire on September 25, 2020, to October 24, 2020.  *Id.* ¶¶ 41, 45-46.  Ruby Has denies that the Exclusivity Period was extended a second time and alleges that it expired on October 24, 2020.  *Id.* ¶ 47.  Due diligence continued through the summer and fall of 2020.  *Id.* ¶ 39.

During this time period, "Cambridge kept trying to retrade material deal terms."  *Id.* ¶ 48. Throughout September, October, and November 2020, Cambridge Capital pressed Ruby Has to reduce the purchase price by $2 million based on an alleged working capital adjustment.  *Id.* ¶¶ 38, 59.  In late November, Cambridge Capital suddenly demanded that its expenses be deducted from the consideration payable to the existing Ruby Has equity holders rather than be paid by the company as set forth in the LOI.  *Id.* ¶ 60.  Then, on November 30, 2020, Cambridge Capital sent a list of proposed resolutions to about ten still-unresolved deal points and raised new issues.  *Id.* ¶ 73.  Among the new terms, Cambridge Capital proposed increasing the shareholder interest being purchased by three percent.  *Id.* ¶¶ 75-77.

After multiple "tense" communications, Ruby Has advised Cambridge Capital on December 1, 2020 that it intended to investigate hiring an investment banker to assist it in finding a more suitable investing partner.  *Id.* ¶ 79.  The following day, on December 2, 2020, one of Ruby Has's competitors, ShipMonk, publicly announced that it had raised $290 million from a blue-chip investor known as Summit Partners.  *Id.* ¶ 80.  To Ruby Has, the announcement made clear that the market was valuing ecommerce fulfillment companies at far more than Cambridge Capital was offering for Ruby Has, and, as a consequence, Ruby Has informed Cambridge Capital that it would not proceed with the proposed transaction.  *Id.* ¶¶ 80-81.

On December 10, 2020, Cambridge Capital sent Ruby Has an invoice for approximately $400,000 of expenses it allegedly incurred in the negotiations; Ruby Has asked Cambridge Capital for the legal basis for demanding payment since the LOI's expense provision was non-binding.  *Id.* ¶ 82.  On December 31, 2020, Cambridge Capital commenced this action.  *Id.* ¶¶ 82-83.

### B.    Cambridge Capital's Alleged False Representations

Ruby Has alleges that Cambridge Capital made misrepresentations to induce Ruby Has to enter into the LOI's exclusivity agreement and to induce Ruby Has to enter into an investment transaction.  *Id.* ¶ 97.  Ruby Has alleges that Cambridge Capital repeatedly falsely represented that it had "the cash on hand available to close the potential transaction," *id.* ¶ 18, that its partners included "successful people in the industry, available to work on Ruby Has' behalf if a deal closed," *id.* ¶ 20, that Cambridge Capital worked with existing management rather than replacing them, *id.* ¶ 24, and that it was "a financially strong and stable company with many investments, and with access to substantial financial resources for Ruby Has going forward if needed," *id.* ¶ 25.  Gordon also allegedly made various representations regarding his own accomplishments including that he had a "pristine reputation in the industry."  *Id.* ¶ 21.  "Ruby

Has relied on these representations in agreeing to proceed with negotiations, and in signing the [LOI] and later extending the Exclusivity Period in the LOI until October 24, 2020."  *Id.* ¶ 26.

In addition, in October 2020, Cambridge Capital and Gordon misrepresented the truth about Gordon's regulatory history.  *Id.* ¶ 72.  Ruby Has had included a "Bad Actors" provision in a draft Stockholders Agreement requiring the parties to represent that there was no "bad actor" disqualifying event as defined in Rule 506(d)(1)(i)-(iii), promulgated under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, to help ensure that the company would be able to engage in a future public offering.[3]  *Id.* ¶ 66.  But in late November 2020, Cambridge Capital struck the provision from the draft without any explanation.  *Id.* ¶ 67.  At a dinner in October 2020, Gordon told Ruby Has that he had been involved in a failed investment involving an unnamed Israeli company and Cambridge Capital investors, that there was a lawsuit involving the investment, and that Gordon or Cambridge paid $100,000 to "make it go away."  *Id.* ¶ 68.  Gordon claimed that he had been defrauded by two individuals associated with the Israeli company and that Cambridge Capital investors were upset with him as a result.  *Id.*  He failed to disclose, and Ruby Has learned only later, that he was a defendant in the lawsuit brought by the investors and was accused of being part of the fraud, that the SEC had commenced an investigation into his conduct, and that he ultimately agreed to a Consent Order, or an Order Instituting Administrative and Cease and Desist Proceedings, in which he agreed to the SEC's findings that he willfully

---

[3] "Rule 506 permits sales of an unlimited dollar amount of securities to be made without Securities Act registration, provided that the requirements of the rule are satisfied." Disqualification of Felons and Other "Bad Actors" From Rule 506 Offerings, 78 Fed. Reg. 44730-01, 44731 (July 24, 2013).  "'Bad actor' disqualification requirements . . . disqualify securities offerings from reliance on exemptions if the issuer or other relevant persons (such as underwriters, placement agents and the directors, officers and significant shareholders of the issuer) have been convicted of, or are subject to court or administrative sanctions for, securities fraud or other violations of specified laws."  *Id.*

violated Section 17(a)(2) of the Securities Act and Section 14(a) of the Securities Exchange Act

of 1934, 15 U.S.C. § 78a, *et seq.*, and agreed permanently to cease and desist from future

violations of Sections 17(a)(2) and 14(a).  *Id.* ¶¶ 69-70.  Ruby Has alleges that had it known

about the SEC Consent Order in June 2020, it never would have signed the LOI, extended the

Exclusivity Period, or spent months negotiating the potential transaction with Cambridge

Capital.  *Id.* ¶ 72.

> **C.**      **Cambridge Capital's Alleged Violations of the Non-Disclosure Agreement**

Ruby Has alleges that Cambridge Capital disclosed Ruby Has's confidential information

in violation of a written non-disclosure agreement ("NDA") signed by the parties and dated April

11, 2019.  *Id.* ¶ 13; Dkt. No. 41-1 ("Exhibit 1, NDA").  The parties entered into the NDA in

anticipation of a discussion in 2019 regarding a potential investment.  Am. Countercl. ¶ 13.  The

NDA, which is incorporated by reference to the Amended Counterclaims, required Cambridge

Capital to "treat confidentially" the "non-public information regarding Ruby Has" "whether

furnished before or after the date of this letter."  Exhibit 1, NDA at 1.  Cambridge Capital agreed

to only use the confidential material for purposes of its prospective investment, Am. Countercl.

¶ 13, and agreed that it "will not be used for competitive purposes or to obtain any commercial

advantage with respect to [Ruby Has], and that such information will be kept confidential,"

Exhibit 1, NDA at 1.  The NDA also provided:  "This agreement shall terminate one year from

the date hereof."  *Id.* at 2.

When the parties commenced discussions again in 2020 regarding a possible investment,

they agreed on or about May 14, 2020 to continue the NDA.  Am. Countercl. ¶ 16.  "The parties

confirmed this agreement, orally and in writing, including but not limited to in a July 3, 2020,

email from Smalley (stating 'as we are a pending major investor, and have NDA and exclusive

LOI in place with you, there really should be no issues to show us the contract'), a July 8, 2020,

email from Smalley (confirming that a third-party contract 'is subject to our NDA, which of course we honor in all respects'), and during discussions between the parties in October 2020." *Id.*

Cambridge Capital allegedly violated the NDA by including in its Complaint "confidential information about Ruby Has that it learned during the course of due diligence and negotiations of a potential investment" and by filing the Complaint without any effort to file under seal.  *Id.* ¶ 111.  Among other confidential information, *see id.* ¶¶ 90, 112, Cambridge Capital disclosed the "alleged terms of the proposed transaction," ostensibly to interfere with Ruby Has's stated intention and ability to sell itself to a different investment partner, *id.* ¶ 84. Ruby Has consulted with an investment banker after Cambridge Capital's lawsuit was filed, and the banker advised that the existence of the lawsuit would materially and adversely impact the price and other terms of potential deals with other investors and may deter some potential investors from investing at all.  *Id.* ¶ 95.  Ruby Has alleges that the existence of the lawsuit has already derailed efforts to pursue potential investments in Ruby Has.  *Id.*

## PROCEDURAL HISTORY

Cambridge Capital filed its Complaint on December 31, 2020.  Dkt. No. 1.  It brings causes of action for breach of the LOI (Count One), breach of the duty to negotiate in good faith in connection with the LOI (Count Two), breach of the September 14, 2020 Deal Points Memo (Count Three), breach of the December 1, 2020 oral agreement to close (Count Four), breach of the duty of good faith and fair dealing (Count Five), promissory estoppel (Count Six), unjust enrichment (Count Seven), and quantum meruit (Count Eight).

Ruby Has filed its motion to dismiss Counts Two to Eight of the Complaint and to narrow Count One on February 17, 2021.  Dkt. No. 10.  Cambridge Capital filed its

memorandum in opposition to the motion on March 24, 2021.  Dkt. No. 34.  Ruby Has filed its

reply memorandum in further support of its motion on April 21, 2021.  Dkt. No. 39.

Ruby Has answered as to the portion of Count One not subject to its motion to dismiss

and filed its Amended Counterclaims against Cambridge Capital, Gordon, and Smalley on April

28, 2021.[4]  Dkt. Nos. 40-41.  Ruby Has asserts four counterclaims: fraud against all

Counterclaim Defendants (Counterclaim Count One); breach of the NDA against Cambridge

Capital (Counterclaim Count Two); tortious interference with prospective business relations

against all Counterclaim Defendants (Counterclaim Count Three); and prima facie tort against all

Counterclaim Defendants (Counterclaim Count Four).  Dkt. No. 41.

Cambridge Capital moved to dismiss Ruby Has's amended counterclaims on May 12,

2021.  Dkt. No. 45.  Ruby Has filed its memorandum in opposition to the motion on June 7,

2021.  Dkt. No. 48.  Cambridge Capital filed its reply memorandum in further support of the

motion on June 16, 2021.  Dkt. No. 52.

The Court held oral argument on both motions to dismiss on September 15, 2021.

### LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570

(2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of

the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

---

[4] Ruby Has filed its initial answer as to Count One and counterclaims on March 2, 2021.  Dkt.
No. 22.  Cambridge Capital moved to dismiss the counterclaims on April 7, 2021.  Dkt. No. 36.
Thereafter, Ruby Has filed its answer as to Count One and Amended Counterclaims.  Dkt. Nos.
40-41.

enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (quoting *Orientview Techs. LLC v. Seven For All Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)); *see also Oneida Indian Nation v. Phillips*, 981 F.3d 157, 165 (2d Cir. 2020).

## DISCUSSION

The Court first addresses Ruby Has's motion to dismiss and then turns to Cambridge Capital's motion to dismiss the counterclaims.

## I.    Ruby Has's Motion to Dismiss the Complaint

Ruby Has moves to dismiss Counts Two to Eight of the Complaint and to narrow Count One, which alleges in part that Ruby Has violated the LOI's Exclusivity Period.  Ruby Has argues that the LOI is preliminary and non-binding save for the enforceable obligation created with respect to the Exclusivity Period.  All of Ruby Has's arguments turn, to some extent, on the characterization and enforceability of the LOI.  The Court first examines that issue before addressing each of Ruby Has's arguments for dismissal.

A.      The Enforceability of the LOI

The parties stake out opposing positions on the enforceability of the LOI.  Ruby Has

argues that the LOI is non-binding and creates no legal obligations on either side except for those

based on the exclusivity provision.  Cambridge Capital argues that the LOI constitutes a Type II

agreement—"a contract that expresses mutual commitment to a contract on certain agreed terms,

with others to be negotiated," *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1141 (Del.

2015) ("*SIGA II*") (internal quotation marks omitted)—thereby imposing an obligation to

negotiate in good faith.  Cambridge Capital also argues that both the exclusivity provision and

the expenses provision of the LOI create enforceable obligations.

Delaware law applies to the interpretation of the LOI.[5]  Delaware law follows New York

law in recognizing that parties can create between themselves an obligation to negotiate in good

faith; under that law, binding preliminary agreements fall into one of two categories.  *See SIGA

Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 343-46 (Del. 2013) ("*SIGA I*"); *SIGA II*, 132

A.3d at 1142 (Valihura, J, concurring in part and dissenting in part) ("This Court first applied

New York's bifurcated approach to preliminary agreements in *SIGA I*."); *see also Teachers Ins.

& Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) ("*Tribune*")

("Preliminary contracts with binding force can be of at least two distinct types."); *Arcadian

Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989) ("In *Tribune*, Judge Leval

identified two types of preliminary agreements.").  Type I preliminary agreements "are 'created

---

[5] Neither party disputes that Delaware law applies.  Both parties have relied on Delaware law in
their memoranda of law and therefore have implicitly consented to the application of Delaware
law.  *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 771 (S.D.N.Y. 2011) ("This
'implied consent . . . is sufficient to establish choice of law.'" (quoting *Krumme v. WestPoint
Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))).  At oral argument, Ruby Has conceded that
there is no relevant difference among Delaware, New York, and Pennsylvania law with respect
to its arguments on this motion.  *See* Transcript of September 15, 2021 Hearing ("Hr'g Tr."),
4:16 to 5:6.

when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document.'" *SIGA II*, 132 A.3d at 1141 (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008)). "Type I agreements 'render the parties fully bound to carry out the terms of the agreement even if the formal instrument is never executed.'" *Id.* (quoting *Vacold*, 545 F.3d at 124). A Type II preliminary agreement, by contrast, is "a contract that expresses mutual commitment to a contract on certain agreed terms, with others to be negotiated." *Id.* (internal quotation marks omitted) (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 206 n.3 (2d Cir. 2002)). "Type II preliminary agreements 'do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'" *Id.* (alteration in original) (quoting *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005)). "[A] party to a Type II preliminary agreement is barred 'from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" *Id.* (quoting *Tribune*, 670 F. Supp. at 498). "Ultimately, '[i]f the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation."'" *Id.* (alteration in original) (quoting *Vacold*, 545 F.3d at 124).

"In Delaware the intention of the parties controls the creation of a good-faith duty to negotiate under a letter of intent." *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *8 (Del. Super. Ct. Oct. 27, 2015) (quoting *SIGA I*, 67 A.3d at 345). "The considerations relevant to whether a preliminary agreement is a binding Type II agreement are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity

of putting the agreement in final form, as indicated by the customary form of such transactions."
*Brown*, 420 F.3d at 157.

Drawing all reasonable inferences in favor of Cambridge Capital, as it must on a motion
to dismiss, the Court concludes that enough has been pleaded to establish that the LOI is a Type
II preliminary agreement.  In other words, Cambridge Capital has sufficiently pleaded that the
LOI bound the parties to negotiate open terms in good faith under the LOI's framework but did
not bind them to the LOI's terms (except for the exclusivity provision) or to reaching the
ultimate contractual objective prior to entering into a share purchase agreement.

"[The] first and most important factor looks to the language of the preliminary agreement
for indication whether the parties considered it binding or whether they intended not to be bound
until the conclusion of final formalities."  *Tribune*, 670 F. Supp. at 499.  There is language in the
LOI that supports Cambridge Capital's argument that the parties intended it to reflect a binding
Type II agreement, with open terms to be worked out in good faith.

The LOI is striking in the detail it provides.  It contains the parties' agreement on many
major terms, including the purchase price, the transaction structure, the agreed percentage of the
company that Cambridge Capital receives for its capital infusion, and a due diligence process.
LOI at 2-3.  It even includes governance provisions for the future after Cambridge Capital has
completed its investment.  *Id.* at 3.  The governance provision states that Cambridge Capital will
pursue acquisitions only if a super majority, including the CEO and Cambridge Capital, agree to
do so.  *Id.*  It further sets forth the specific annual management fee that Ruby Has agrees to pay
Cambridge Capital.  *Id.*

Nothing on those general terms appears to be left open.  They each are expressed in
concrete terms.  Indeed, the LOI goes forward to reflect that the high interest debt on Ruby Has's

balance sheet will be paid off and refinanced only upon mutual agreement, *id.* at 2, and that there

will be a working capital adjustment subject to certain parameters, i.e., "consistent with historical

working capital requirements of the Company, including consideration of historic seasonality,"

*id.* at 3.

   In words that are mandatory and not merely aspirational, the LOI also sets forth a process

each party is required to follow to reach final agreement and then closing.  Both parties have

obligations and not just goals with respect to diligence.  While Cambridge Capital must conduct

a due diligence review and select an independent chartered accountant to perform "[a] review of

[Ruby Has's] historical financial statements Quality of Earnings analysis," *id.* at 3, Ruby Has

"*will* use their best efforts to make available all documents, facilities and personnel as requested

so that [Cambridge Capital] can properly due diligence the Company during the exclusivity

period," *id.* at 5 (emphasis added).  The LOI sets a deadline that Cambridge Capital "*will*

complete" the due diligence requirements "within 90 days of the execution of this [LOI]."  *Id.* at

3 (emphasis added).  It goes on to reflect Cambridge Capital's "intent is to move forward to a

*closing* as quickly as possible," not just to negotiation and consummation of final transaction

documents.  *Id.* at 3 (emphasis added).[6]  These details of the LOI weigh in favor finding that it is

a Type II agreement.  *See Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 381 (S.D.N.Y.

2014) (finding that obligations to complete a due diligence process within a certain time period

and to obtain necessary internal approvals "suggests that the document was a Type II

agreement").

---

[6] The LOI also provides that the transaction will require the consent of Ruby Has's customers, lessors, and suppliers prior to closing as well as the completion of all necessary governmental and regulatory filings.  *Id.*

Notably, the LOI also expressly states that it is "an expression of mutual intent to proceed with the drafting of the share purchase agreement and collateral documents contemplated hereby in accordance with the principles stated herein."  LOI at 5; *see also Brown*, 420 F.3d at 158 (finding that the parties' statement to "work together in accordance with the terms and conditions outlined [in a Memorandum of Understanding ("MOU")]" constitutes "clear evidence of an intention to be bound to the MOU as a general framework in which the parties will proceed in good faith").  Additionally, the LOI was "Agreed and Accepted" by Ruby Has and signed by both parties.  *See, e.g.*, *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 229 (S.D.N.Y. 2009) ("Most strikingly, the Initial Commitment was 'Accepted and Agreed' by both parties . . . indicating that the parties may have intended to be bound."); *Tribune*, 670 F. Supp. at 499 (finding that use of the words "Accepted and agreed to" in signing supported intention to create binding obligation).  Together with the agreed upon major terms and the framework established by the LOI, this language suggests that the parties intended to be bound— not to the specific terms contained in the LOI or to the "ultimate contractual objective," *Tribune*, 670 F. Supp. at 498, but rather to the LOI's framework in which the parties would negotiate the final deal in good faith.

Ruby Has puts dispositive weight on a section entitled "Non-Binding Agreement," which provides in part:  "This [LOI] is not intended to be a binding contract (other than with respect to the section herein titled *Exclusivity Period*) . . . ."  LOI at 5.  Although that language can be read to support Ruby Has's argument that the LOI should not be read to create even Type II obligations, the Court cannot conclude that it eliminates all ambiguity and entitles Ruby Has to dismissal of Cambridge Capital's claim on this motion.

In the first instance, it is a fundamental precept of contract law that agreements must be read in their entirety and that no provision of a contract draws the entirety of its meaning from examining is language in isolation.  "In determining whether a letter of intent is sufficient to give rise to a duty to negotiate in good faith, [the Court] must examine the entire document and the relevant circumstances surrounding its adoption."  *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 482 (E.D. Pa. 2010) (citing *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986)).  Under Delaware law, language that an agreement's terms are non-binding does not alone relieve a party of an obligation otherwise created to negotiate in good faith.  *See SIGA I*, 67 A.3d at 346; *see also Gas Nat.*, 33 F. Supp. 3d at 381 ("The parties' description of the LOI as a 'non-binding letter of intent,' while relevant, is not determinative.").  Although the language of the "Non-Binding Agreement" section thus weighs in favor of a conclusion that the agreement creates no obligations whatsoever (save for those imposed on Ruby Has with respect to exclusivity), there are other provisions that point in the other direction.

Moreover, even when read in isolation, the language of the "Non-Binding Agreement" provision is not as definitive as Ruby Has would have it be.  The provision states that the LOI "is not intended to be a binding contract," not that it is intended not to create any obligation.  It thus plausibly could be read to reflect the parties' agreement that the LOI does not create any binding obligations of a Type I variety.  Under that reading, the parties would not ultimately be committed even to the terms that are reflected in the LOI (other than with respect to the section titled *Exclusivity Period*).  Ruby Has need not, for example, conduct its business in the ordinary course during the time until negotiation and consummation of final papers on pain of a breach of

contract claim if it fails to comply.  But they are not relieved of the obligation to negotiate the open terms in good faith within the framework of the terms agreed in the LOI.

That reading gains some force from additional language in the "Non-Binding Agreement" provision.  The provision does not end with stating that the LOI "is not intended to be a binding contract"; it continues with the language: "the parties understand that no obligation exists on behalf of either Cambridge [Capital] to pay the Purchase Price or on behalf of the Company to sell the units prior to entering into the share purchase agreement."  LOI at 5.  It is plausible to read the language of the two clauses—joined by the conjunction "and" in the same section—as relating to one another and thus to read the second clause as amplifying and elucidating the first.  On this reading, then, the first clause was intended only to make clear that there would be no binding agreement of a Type I variety—the LOI itself did not create an obligation on the part of Cambridge Capital to pay for the units or an obligation on the part of Ruby Has to sell them, not that it did not create an obligation of any kind whatsoever.  The interpretation is reinforced by language elsewhere in the LOI that says:  "Final approval from the Investment Committee of Cambridge Capital will be required prior to completing the Potential Transaction."  *Id.* at 4.  The language reflects conditions to the consummation of the ultimate contractual objective; it would have been unnecessary if the LOI created no obligation whatsoever.  It can plausibly be argued that all of this language would have been unnecessary and surplusage if, as Ruby Has would have it, no obligation of any sort and with respect to any matter (except for exclusivity) was created by the LOI.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.  We will not read a contract to render a provision or term meaningless or illusory." (internal quotation

marks and citation omitted)).  The inclusion of this clause suggests the existence of other

obligations arising from the LOI, but that these other obligations do not include reaching the

ultimate contractual objective.  *See Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA),*

*Inc.*, 401 B.R. 598, 625 (S.D.N.Y. 2009) ("'Contracts of preliminary commitment

characteristically contain language reserving rights of approval and establishing conditions such

as the preparation and execution of documents satisfactory to the contracting party.' . . . [S]uch

terms of reservation, are 'by no means incompatible with intention to be bound.'" (quoting

*Tribune*, 670 F. Supp. at 500)).

    This reading also gains force from language in the Governing Law section.  That

provision states that "[t]his [LOI], *and any non-contractual obligations arising out of or in*

*connection with it*, shall be governed by and constructed in accordance with the laws of the state

of Delaware."  LOI at 5 (emphasis added).  This provision can be read to contemplate that there

may be "non-contractual obligations arising out of or in connection with [the LOI]."  But, if that

is so, Ruby Has fails to identify what those obligations would be—if they are not obligations of a

Type II variety to act in good faith with respect to negotiations.  For example, such obligations

would not relate to a claim of tortious interference; it is black letter law that a claim of tortious

interference does not lie between two parties to a contract.  *See, e.g.*, *Finley v. Giacobbe*, 79 F.3d

1285, 1295 (2d Cir. 1996) ("[A] plaintiff bringing a tortious interference claim must show that

the defendants were *not parties to the contract*.").  And a claim for negligent or intentional

misrepresentation might be "in connection with" the LOI, but it would not "arise out of" the LOI.

The language suggests there are obligations arising out of the LOI, i.e., that "the parties intended

to create enforceable rights and obligations."  *FCOF*, 663 F. Supp. 2d at 229.

The language of the LOI here thus is strikingly different from the "non-binding"

language in *CKSJB Holdings LLC v. EPAM Sys., Inc.*, 837 F. App'x 901 (3d Cir. 2020), upon

which Ruby Has relies.  In that case, the indication of interest ("IOI") at issue stated:  "This

proposal does not constitute and *will not give rise to any legally binding obligation* whatsoever

on the part of [the party expressing the indication of interest]."  *Id.* at 902.  It also went on to

state:

> [E]xcept as expressly provided in any binding written agreement that [the parties]
> may enter into the future, *no past, present or future action*, course of conduct, or
> failure to act relating to the transaction . . . and/or by this proposal *will give rise to
> or serve as the basis for any obligation* or other liability on the part of such entities
> or any of their respective affiliates.

*Id.* at 902-03.  The clause thus notably precluded either side from relying on any past action,

including the kinds of action that could provide parol evidence, to create an obligation on either

party.

In those circumstances, and confronted with a letter that stated that the party expressing

the interest would provide a "definitive list" of conditions to closing upon completing its due

diligence and that as the process moved forward it might require a commitment of exclusivity,

*id.* at 903, the Third Circuit held that the language alone that the putative purchaser would "work

diligently" with the target "to close the transaction in an expedient manner" was mere "optimistic

language" that did not create any obligation to negotiate in good faith and that the claim was

dismissable at the pleadings stage.  *Id.* at 903-04.

Here, unlike in *CKSJB Holdings*, the LOI expressly contemplates that there could be such

"obligations arising out of or in connection with" the LOI.  And the LOI could be read to specify

the subjects on which the parties do *not* agree—the ultimate agreement by Ruby Has to sell units

to Cambridge Capital and by Cambridge Capital to infuse capital into Ruby Has in exchange for

those units.  The language of the IOI in *CKSJB Holdings*, by contrast, expansively disclaims

"any obligation" arising from "past, present or future action, course of conduct, or failure to act relating to the transaction."  The language of the LOI here is not akin to that of the IOI's expansive disclaimer.

In addition, in this case, unlike in *CKSJB Holdings*, there is an exclusivity provision, and there is language that can be read to set forth the conditions upon which Cambridge Capital will continue to conduct due diligence—and if it has completed due diligence, will continue to the signing of a final agreement—and that expresses a "mutual" intent of the parties to move forward with "the drafting of the share purchase agreement and collateral documents."  This is more than just the separate aspirational intent of each party or the "negotiation" of an agreement. Among other things, under the LOI, Ruby Has commits—in language all agree to be binding— that it will take itself out of the market for the Exclusivity Period (during which it alleges it was in critical need of capital).  If it breached that agreement, Cambridge Capital would be entitled to damages even if no final agreement were reached, including, for example, its incurred due diligence costs.  That is why the LOI states that Cambridge Capital "will defer other projects, deploy significant resources, and incur material expenses in order to promptly try to consummate the Potential Transaction."  LOI at 5.  The LOI also establishes what are plainly expressed to be conditions to Cambridge Capital moving forward.  The results of the accounting review and quality of earnings analysis must be "satisfactory" to Cambridge Capital, and so too must the due diligence review, "including that the Company is on track to achieve its forecasted revenue" for 2020.  *Id.* at 3.  And Ruby Has must conduct its business in the ordinary course "[u]ntil the execution and delivery of the share purchase agreement or such earlier date as negotiations may terminate."  *Id.* at 4.

In the face of all of these provisions, it is plausible that Cambridge Capital had a duty to negotiate in good faith and that Ruby Has would have had a claim of a Type II variety if it were revealed, at the end of the Exclusivity Period and after Ruby Has had limited itself to business in the ordinary course, that Cambridge Capital never had an intent to negotiate in good faith.  That would be so notwithstanding what Ruby Has claims is the clear language of the first clause of the Non-Binding Agreement provision.  The language conditioning Cambridge Capital's obligation to move forward on Ruby Has's cooperation in due diligence and on the results of the accounting review and quality of earnings analysis would be mere surplusage if Cambridge Capital could walk from the transaction (or never have intended to negotiate it in good faith) for reasons entirely independent on those set forth in the LOI.

It necessarily follows that, at least at this stage of the proceedings, the language of Non-Binding Agreement cannot bear the weight Ruby Has puts on it.  The Non-Binding Agreement section, by its terms, is indifferent to party.  If the LOI as a whole can be read to admit of an obligation on Cambridge Capital to negotiate in good faith, notwithstanding the language of Non-Binding Agreement, so too it can be read to admit of such an obligation on the part of Ruby Has.

Finally, Cambridge Capital's argument that the LOI gave rise to Type II obligations also gains force, at least at the pleading stage, by the context of the negotiations and by each parties' partial performance—factors not considered by the court in *CKSJB Holdings* due to the unambiguous language in the IOI.  *See Brown*, 420 F.3d at 157; *see also FCOF*, 663 F. Supp. 2d at 229 ("[F]or the Type II inquiry, courts place more emphasis on the context of the negotiations and less on the existence of unresolved terms.").  Before entering into the LOI, the parties engaged in "in-person meetings and deep discussions over the past year."  LOI at 1.  This fact

28

favors finding an obligation to negotiate in good faith. *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 229 (S.D.N.Y. 2012) (finding that a "lengthy negotiation period" of "nine months of negotiations and several rounds of offers and counteroffers" "prior to the execution of the LOI plausibly supports the conclusion that the parties intended to continue negotiating after the LOI, and thus were bound to do so in good faith"); *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 415 (S.D.N.Y. 2011) (finding that "the context from which [agreement] arose may also favor the finding of a binding good faith obligation to proceed" where the agreement "was the 'culmination of several months of discussions and negotiations between [the parties]'" (second alteration in original)); *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 446 (S.D.N.Y. 2003) (finding that "at least two meetings and several conversations regarding the deal" prior to the agreement weighs slightly in favor of finding an intent to be bound to a preliminary commitment).

Regarding partial performance, Cambridge Capital performed due diligence as promised, and Ruby Has made diligence materials available as promised. *See Brown*, 420 F.3d at 158 (finding the provision of "extensive and valuable performance within the framework described" "cuts strongly in favor of finding [the agreement] to be a Type II agreement"); *FCOF*, 663 F. Supp. 2d at 230 (finding that taking "significant steps in reliance on [the agreement]" such as "complet[ing] the due diligence required by [it]" "supports a finding that the parties may have intended [it] to create enforceable obligations"); *EQT Infrastructure*, 861 F. Supp. 2d at 230 (stating that a party's effort to conduct due diligence and draft documents necessary to complete the potential transaction, including hiring lawyers, accountants, and consultants, as contemplated by the LOI, weighs in favor of finding that the parties were bound to continue negotiating in good faith). When Ruby Has fell short of its working capital and cash balance forecasts, the

parties negotiated an adjustment for working capital as contemplated by the LOI.  Compl. ¶ 60.

These allegations are suggestive of the conclusions both that the LOI reflects the agreement of

the parties on the major terms of the transaction and that each party understood it was obligated

to negotiate in good faith within the confines of the agreed framework created by the LOI.

This case is distinguishable from *Bennett v. Itochu Int'l Inc.*, 572 F. App'x 80 (3d Cir.

2014), the other case upon which Ruby Has principally relies.[7]  In *Bennett*, after "a soured

partnership between two businessmen and their companies," the plaintiff brought a claim for

breach of a duty to negotiate in good faith, among other claims.  *Id.* at 82.  The term sheet in

*Bennett* noted that the purchaser agreed to "[u]ndertake a firm and committed effort to close the

transaction."  Dkt. No. 60-2 at 2.[8]  The term sheet also provided:  "Other than the preceding

sentence [regarding exclusivity], this summary of terms is not, and is not intended to be, a legally

binding commitment by the parties hereto.  Any such binding commitment will be evidenced by

the execution of definitive agreements which will set forth all binding provisions."  *Id.* at 5.  On

a motion to dismiss, the district court recognized the non-binding provision in the term sheet but

concluded that "this language is not definitive proof that a duty to negotiate in good faith did not

arise."  *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 482 (E.D. Pa. 2010) (citing *Channel*

*Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986), for

the proposition that "a non-binding letter of intent is sufficient to give rise to a duty to negotiate

in good faith").

---

[7] Ruby Has also relies on *Beekman Inv. Partners, L.P. v. Arlene Candles, Inc.*, 2006 WL 330323
(S.D.N.Y. Feb. 14, 2006), in which the district court did not find a duty to act in good faith.  The
plaintiff in *Beekman*, however, did not argue that the parties had entered into a Type II
preliminary agreement, and the language cited by Ruby Has does not squarely address whether a
duty to negotiate arose from the LOI.
[8] Before oral argument, counsel for Ruby Has submitted a copy of the letter of intent and term
sheet in *Bennett*.  Dkt. Nos. 60, 60-1, 60-2.

The district court in *Bennett* granted summary judgment to the defendant but only after discovery and only on the basis that the plaintiff had "failed to identify a specific promise to negotiate in good faith apart from . . . uncorroborated and conclusory allegations to that effect." 572 F. App'x at 84.  The only evidence that the plaintiff identified, even after discovery, was language in the term sheet that the parties agreed to make "a firm and committed effort to close," but plaintiff's reliance on that language was undermined by "unambiguous language [in the same document] to disclaim any intent by the parties to bind each other." *Id.*  In that context, the court held that the language was not itself sufficient to create a triable issue.

Of course, it is conceivable that the LOI could be read another way and that the language regarding non-binding agreement could be read to eliminate any obligations of either side save for those imposed on Ruby Has with respect to exclusivity.  But on this motion, all that Cambridge Capital has to establish to go forward with discovery is that there is an ambiguity and that its reading is plausible.  *See, e.g.*, *Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) ("[I]f a contract is ambiguous as applied to [the facts that furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to state a claim." (alteration in original) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 178 (2d Cir. 2004))); *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) ("[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion." (internal quotation marks omitted)); *Bank of New York Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning—each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it

should be submitted to the trier of fact." (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993))).  Cambridge Capital has done so.

The Court turns to each of Ruby Has's arguments for dismissal.

### B.     Count One for Breach of the LOI Must Be Dismissed in Part

Ruby Has argues that Count One for breach of the LOI must be dismissed to the extent it alleges a claim for expenses and for a violation of the Exclusivity Period beyond October 25, 2020.  First, Ruby Has argues that Cambridge Capital's claim for breach of the expenses provision fails to state a claim for relief as Ruby Has had no enforceable obligation to reimburse Cambridge Capital for its expenses.  Ruby Has also argues that, even if the expense provision were enforceable, it was not triggered.  The expense provision only provides for the reimbursement of expenses "required to consummate" the potential transaction; since no transaction was consummated, there were no expenses required to consummate it, and the provision was never triggered.  Next, Ruby Has argues that Count One must be dismissed to the extent that it claims damages for breaches of the Exclusivity Period after October 25, 2020.  It contends that the Complaint's allegations of a second extension of the Exclusivity Period are vague, conclusory, and too indefinite to state a claim for relief.  Both arguments are well taken.

Cambridge Capital has not pleaded that the expense provision itself created an enforceable obligation on the part of Ruby Has to pay its expenses.  Even accepting Cambridge Capital's argument that the LOI created a duty to negotiate in good faith, "Type II preliminary agreements "do[] not commit the parties to their ultimate contractual objective."  *SIGA II*, 132 A.3d at 141; *see also ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 2015 WL 5710947, at *8 (S.D.N.Y. Sept. 29, 2015) ("Although a Type I agreement is fully binding as to all material elements of the underlying contract, a Type II agreement is not.  It merely obligates the parties to negotiate in good faith toward a final agreement."); *cf. Adjustrite Sys., Inc. v. GAB Bus. Servs.,*

*Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) ("[I]f a preliminary agreement is of the first type, the parties are fully bound to carry out the terms of the agreement even if the formal instrument is never executed.").

The language of the LOI as a whole, as well as that of the "Expenses" provision, make clear that the LOI did not create Type I obligations to the ultimate contractual objective or obligate Ruby Has to pay Cambridge Capital's reasonable out-of-pocket fees and expenses.  At most, it committed Ruby Has to negotiate the open terms—and if the parties reached agreement on those ultimate terms—to sign a contract that once consummated would require Ruby Has to pay Cambridge Capital's expenses.  The LOI does not reflect that "the parties reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation" or "an agreement that [was] preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement."  *Tribune*, 670 F. Supp. at 498. The provisions discussed in the foregoing section, including the Non-Binding Agreement provision and the provision making any obligation to close on the part of Cambridge Capital conditional upon Investment Committee approval, make it clear that the only Type I obligation the parties agreed upon was that of Ruby Has as to exclusivity.

Cambridge Capital does not disagree that the Non-Binding Agreement provision relieves the parties of any Type I obligations "other than with respect to the section herein titled *Exclusivity Period*."  However, it argues that the reference to the Exclusivity Period should carry with it the expense provision because both are included in the LOI under the heading "Other Considerations."  That argument is precluded by the plain language of the LOI.  The Non-Binding Agreement refers to "the section titled *Exclusivity Period*."  There is a section entitled Exclusivity Period; it contains Ruby Has's obligations with respect to exclusivity.  It does not

contain any obligations with respect to expenses.  The parties easily could have referred to the provisions under the heading "Other Considerations" if they intended each of those provisions to create binding contractual obligations.  They did not do so.[9]

Cambridge Capital next argues that the reference in the Non-Binding Agreement provision must carry with it all of the provisions in the broader "Other Considerations" section because one of the provisions in the Other Considerations section is "Governing Law."  It argues that the parties intended the "Governing Law" provision to be enforceable, notwithstanding the otherwise plain meaning of the Non-Binding Agreement provision, and thus all of the other provisions in the Other Considerations section must also be binding.  The conclusion does not follow from the premise.  The "Governing Law" provision expresses the mutual intent of the parties regarding the law to be applied to disputes arising out of their relationship.  It does not impose contractual obligations; the application of the Governing Law section and its meaning is a question of conflict of laws and not of contract.  *See* Restatement (Second) of Conflict of Laws § 187 (1971).  And even if, reading the LOI as a whole, the Governing Law provision were to be given weight—in the sense that a court ordinarily would honor it, the conclusion does not follow that the parties intended all of the other provisions under Other Considerations to create binding contractual obligations.  A court engaged in the exercise of interpretation can draw a distinction between those provisions creating obligations on one or the other party and those provisions that direct how and where a dispute between them will be resolved.  *Cf. Huffman v. Hilltop*

---

[9] Cambridge Capital's argument would have sweeping implications.  The Ordinary Course covenant is contained in the "Other Considerations" section.  Under Cambridge Capital's argument, that clause would not be limited to stating a condition for Cambridge Capital to negotiate and agree upon a transaction within the framework agreed by the parties.  Rather, it would give rise to independent contractual rights on the part of Cambridge Capital permitting it to sue Ruby Has for damages—even if Cambridge Capital chose in the end not to engage in a transaction.

*Companies, LLC*, 747 F.3d 391, 397-98 (6th Cir. 2014) (holding that "the parties' omission of the arbitration clause in the survival clause did not clearly imply that the arbitration clause had no post-expiration effect" after "considering the contract as a whole—the survival clause and its relationship to the other clauses in the agreement").  Accordingly, under the LOI's expressed language and its ordinary meaning, no contractual obligations of a Type I type were created by the LOI.

Indeed, Cambridge Capital's argument would lead to absurd results disfavored under principles of contract interpretation.  *See Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions.").  Cambridge Capital seeks the recovery of its fees and expenses because Ruby Has allegedly walked away from the transaction.  But under its reading of the LOI, Ruby Has would have the same obligation if Cambridge Capital was the one who decided not to go forward with a transaction.  In Cambridge Capital's view, the expenses obligation is not contingent upon the transaction going forward.  Cambridge Capital could have negotiated a bust-fee or some other fee entitling it to coverage for its expenses up to a cap.  It did not.  The "Availability of Due Diligence Materials" provision recognizes that Cambridge Capital will "deploy significant resources and incur material expenses" in due diligence and imposes a corresponding obligation on Ruby Has to use it best efforts to make materials available.  The value Cambridge Capital received for the funds it expended to conduct due diligence was in the form of access to the confidential due diligence materials and the opportunity to make a deal with Ruby Has within the

Exclusivity Period; the value was not in the form of compensation for its due diligence expenses even if it chose not to make such a deal.

For the foregoing reasons, the motion to dismiss Count One to the extent it alleges a claim for expenses is granted.

Ruby Has's motion to dismiss Count One to the extent it alleges a breach of the Exclusivity provision after October 25, 2020 succeeds, albeit for a different reason. Cambridge Capital's allegation that the Exclusivity Period was extended once is supported by sufficient factual content. The Complaint alleges that it was extended "to October 25, 2020 as reflected in the automatic extension per the LOI and confirmed in an email exchange between counsel for Plaintiffs and Defendants on September 15, 2020." Compl. ¶ 44. Cambridge Capital's allegation that the Exclusivity Period was extended a second time, however, is supported only by "labels and conclusions" and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). After being extended to October 25, 2020, the Exclusivity Period was allegedly "then [extended] until closing by a subsequent agreement between the parties dated October 25, 2020." *Id.* Another part of the Complaint alleges that it "was subsequently extended through December of 2020." *Id.* ¶ 7.

"To state a breach claim, a plaintiff must allege four elements: (1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach by the defendant, and (4) damages suffered as a result of the breach." *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). "Critically, a complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took

place, and the contract's major terms.  Conclusory allegations that a contract existed or that it was breached do not suffice." *Id.* (internal quotation marks and alteration omitted).  Here, the Complaint is bereft of factual content regarding this extension such as who agreed to it, what form such agreement took, when it was agreed to (aside from the conclusion that it was "dated" October 25, 2020), and whether any consideration was exchanged for the extension.  *See, e.g.*, *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 184 (S.D.N.Y. 2009) (dismissing claim where plaintiffs failed to plead "any facts related to the formation of this contract, when it occurred, its terms and conditions, its consideration, or what constituted an offer and acceptance of the contract").  In the absence of such allegations of fact, the Complaint fails to state a claim for the period after October 25, 2020.

Count One is therefore dismissed to the extent it alleges a claim for expenses and a violation of the Exclusivity Period beyond October 25, 2020.

### C.     Count Two for Breach of the Duty to Negotiate in Good Faith Survives the Motion to Dismiss

Ruby Has argues that Count Two, breach of the duty to negotiate in good faith, must be dismissed because a duty to negotiate in good faith does not arise from a preliminary, non-binding LOI that does not contain an express provision requiring negotiation in good faith.  For the reasons discussed, that argument fails, at least at this stage of the proceedings.  Cambridge Capital has pleaded enough to show that the LOI was a Type II agreement encompassing a duty to negotiate in good faith.

Moreover, "[t]o state a claim for breach of contract for failure to negotiate in good faith, a plaintiff must allege the specific instances or acts that amounted to the breach; generalized allegations and grievances will not suffice." *Betty, Inc. v. PepsiCo, Inc.*, 2018 WL 2561028, at *5 (S.D.N.Y. June 4, 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d

Cir. 2011)).  "Although courts occasionally resolve questions of bad faith at the pleading stage, 'the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss.'"  *Id.* (quoting *Gas Nat.*, 33 F. Supp. 3d at 383).

Cambridge Capital alleges that Ruby Has breached its obligation to negotiate in good faith both before and after the alleged second extension of the Exclusivity Period by, among other things, demanding new economic terms inconsistent with the provisions previously agreed-to in the LOI and abandoning negotiations in December 2020.  Compl. ¶¶ 67-68, 71-74, 112. The parties' competing papers reflect contrary views as to whether the positions Ruby Has took were within the framework of the LOI and whether it was Cambridge Capital that demanded terms that differed from that framework.[10]  At this stage, these allegations state a claim for breach of a duty to negotiate in good faith.

### D.   Counts Three and Four for Breach of the Deal Points Memo and the Alleged December 1 Agreement Should Be Dismissed

Ruby Has argues that Count Three (breach of the Deal Points Memo) and Count Four (breach of the agreement allegedly reached on a December 1 phone call) should be dismissed because the LOI required the execution of final transaction documents as well as final approval of the Cambridge Capital board for there to be an enforceable agreement.  Ruby Has also argues that there was no enforceable meeting of the minds with either agreement.

The Court understands Counts Three and Four to be pleaded as an alternative to Count Two.  *See* Fed. R. Civ. P. 8(d) (permitting parties to plead claims in the alternative, regardless of consistency); *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *11 (S.D.N.Y. May 12, 2020) ("[A]lternative pleading is expressly authorized by Rule 8(d)(2) of the Federal Rules of Civil

---

[10] Although Ruby Has disputes the accuracy of Cambridge Capital's allegations of lack of good faith, it does not dispute their sufficiency.

Procedure."). Assuming Cambridge Capital ultimately succeeds on Count Two that the LOI is a Type II binding agreement, Cambridge Capital could not succeed on Counts Three and Four. The LOI requires the parties to enter into a share purchase agreement before Cambridge Capital has an obligation to pay the Purchase Price or Ruby Has has an obligation to sell the units. It contemplates that the parties will "proceed with the drafting of the share purchase agreement and collateral documents contemplated hereby in accordance with the principles stated herein." LOI at 5.

The Complaint, however, does not plead that either the Deal Points Memo or the alleged agreement on the December 1 phone call was a "share purchase agreement." It alleges that the Deal Points Memo was agreed to in advance "of preparing formal transaction documents," Compl. ¶ 61, and in recognition that "the final legal documentation of the purchase agreement needed to be completed," *id.* ¶ 60. The Complaint itself recognizes that "final documentation" and "formal transaction documents" would still need to be prepared. *Id.* ¶¶ 61, 66. It follows that, as alleged, the Deal Points Memo could not have been the "share purchase agreement" the parties agreed would be necessary before there were binding obligations as to the ultimate contractual objective. If drafting remained to be done, then the process of drafting contemplated by the LOI before there were binding obligations could not have been completed.

The same result applies even more clearly to the agreement purportedly reached on the December 1 phone call. The LOI contemplates that there will be a document before the parties are bound to their ultimate contractual objective. It speaks in terms of "the share purchase agreement and collateral documents" that would have to be drafted. LOI at 5. But the December 1 conversation did not result in a document; accepting the allegations as true, it resulted in an "oral agreement." Compl. ¶ 77. The parties recognized that "final transaction documents"

would have to follow.  *Id.*  Thus, assuming that the LOI established "the agreed framework" within which the parties were "to negotiate the open issues in good faith," *Tribune*, 670 F. Supp. at 498, that framework did not admit of the possibility that the parties would be bound to an "ultimate contractual objective" by a document as informal as the Deal Points Memo or that was not expressed in writing like the oral agreement on the December 1 call.[11]

Even if Cambridge Capital does not prevail on its argument that the LOI is a Type II agreement, the Complaint's allegations still do not support a claim as to Counts Three and Four. There is another form of preliminary agreement in the typology besides Type I and Type II preliminary agreement—what might be called a Type III agreement.  Without even creating a duty to negotiate in good faith or other contractual obligation, two parties can each express their mutual intent not to be bound prior to the execution of formal documents, *see R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984), and sign an agreement which reflects that mutual intent and "which presuppose[s] that no binding obligations will be placed upon any party until final contract documents have been signed," *Tribune*, 670 F. Supp. at 497.  In *R.G. Group, Inc. v. Horn & Hardart Co.*, the Second Circuit held that the district court properly ruled that the parties did not intend to create contractual obligations for themselves in the absence of

---

[11] Cambridge Capital argues that the LOI did not require the final agreement to be in writing, stressing that the language in the LOI provided that the agreement had to be "entered into" but not that it had to be signed.  It also argues in its briefing that "the very same individuals who were involved in approving the Deal Points Memo were the ones serving on the Investment Committee for Cambridge Capital."  Dkt. No. 34 at 18.  But, as to the former argument, it is not the lack of signature on the Deal Points Memo that prevents it from creating binding obligations but the fact that it was not the final documentation and the parties' mutual understanding that only the final formal documentation to be drafted would create binding contractual obligations. As to the latter response, this allegation is not contained within the Complaint, and "[i]t 'is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.'"  *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)).

final signed documents where each party had expressed its intent that the agreements they were exchanging in draft would be final only "when duly executed," there was no partial performance, there were some open issues at least at one point in the negotiations, and the contemplated transaction involved "a scale of investment and complexity such that a writing requirement would be expected."  751 F.2d at 76-77.  It so held even though a defendant's representative said in a telephone conversation that the parties had a handshake agreement.  *Id.* at 76.  Judge Mansfield explained, "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent."  *Id.* at 75.

This case follows from *R.G. Group* and its progeny.  The LOI expresses the intent of both Ruby Has and Cambridge Capital that no binding obligation will be placed upon either party until final contract documents have been entered into—until the parties have entered into a share purchase agreement.  There is no allegation that the parties ever later expressed a different intent with respect to when they would be bound.  Nor is there any well-pleaded allegation of partial performance—Cambridge Capital conducted the due diligence and provided the advice that the LOI contemplated would be provided prior to the reaching of an agreement, not solely as part of and in consideration of an agreement.  And the allegations of the Complaint themselves make clear that there were open terms and that the transaction was of complexity.

Thus, Cambridge Capital's allegations regarding the Deal Points Memo and the December 1 phone call fail to establish that the parties intended to enter into the binding contract.  Although Cambridge Capital alleges that the Deal Points Memo "contained all essential terms relating to the investment," Compl. ¶ 64, it does not allege that either party expressed any intent or understanding other than that which had been previously expressed by each in the LOI—that final documents would be required.  "[S]uch an agreement [on terms as in

the Deal Points Memo] can only serve as an indication of the parties' intention to be bound, and cannot, as plaintiffs contend, conclusively establish that the parties intended to be bound." *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 443 (S.D.N.Y. 2003).  "[M]ore is needed than agreement on each detail [to create a binding obligation.  There must be] overall agreement . . . to enter into a binding contract."  *Id.* (alterations in original) (quoting *Tribune*, 670 F. Supp. at 497).  Indeed, the Complaint expressly recognizes that the parties did not intend for the Deal Points Memo itself to create the binding obligations:  "With this final agreement in place, Cambridge [Capital] expected that the formal transaction documents could be quickly drafted and executed."  Compl. ¶ 66.  And the ensuing paragraphs of the Complaint make clear what Cambridge Capital's conclusory allegation bypasses:  there remained terms to be negotiated including the working capital adjustment prior to closing and the structuring of the deal to maximize tax efficiency, both of which were contemplated in the LOI.  LOI at 3; Compl. ¶¶ 66-77.

Cambridge Capital also does not allege facts that would make the December 1 phone call into the binding contract contemplated by the LOI or establish a meeting of the minds and intent to create contractual obligations.  According to the allegations, the parties reached oral agreement on an outstanding open contractual item—the additional cash at closing.  Compl. ¶ 131.  That oral agreement was necessary for the parties to reach a binding agreement, but the Complaint fails to allege facts to support that it was sufficient.  The parties did not agree that the oral conversation would create binding obligations or express an intent other than what the Complaint alleges was expressed in the LOI.  There is not even an allegation like that in *R.G. Group* that the defendant expressly said, "you have an agreement."  The Complaint alleges that "Cambridge [Capital] instructed Ruby Has to sign the final transaction documents on these terms

and deliver them to Cambridge [Capital]."  Compl. ¶ 77.  Cambridge Capital clearly thought the

final transaction documents would be of significance.  The Complaint does not say Ruby Has

agreed that it would sign the documents in the way they had been prepared.  As with the Deal

Points Memo, the parties' "alleged oral agreement . . . must be considered with all the other

words and deeds of the parties, identifiable from the facts alleged in the . . . Complaint and the

incorporated documents, and which would constitute objective signs of their intent to be bound."

*Spencer Trask*, 383 F. Supp. 2d at 443.  There are no allegations in the Complaint sufficient to

establish that Ruby Has expressed an intent to be bound.  *See id.* at 440 ("If . . . either party

communicates an intent not to be bound until he achieves a fully executed document, 'no amount

of negotiation or oral agreement to specific terms will result in the formation of a binding

contract.'" (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985))).

Finally, Cambridge Capital's argument that the LOI is not properly considered on a

motion to dismiss is without merit.  It cites *Federal Insurance Company v. Gander & White

Shipping, Inc.*, 2020 WL 3833408 (S.D.N.Y. July 8, 2020), for the proposition that the LOI

cannot be considered with respect to whether the parties intended to be bound.  Dkt. No. 34 at

17.  But that case is readily distinguishable.  In *Federal Insurance*, the defendant introduced

evidence of a collection note that it argued governed the terms of its agreement with plaintiff.  *Id.*

at *1.  The plaintiff in that case had not attached or incorporated that note into its complaint and

disputed the authenticity and enforceability of the note.  *Id.* at *2.  The court in that case declined

to convert defendant's motion to dismiss into a motion for summary judgment and instead

decided the motion on the complaint alone.  *Id.* at *2-3.  In contrast, the LOI here was

incorporated into the Complaint, and no party disputes its authenticity, accuracy, or relevance.

The Court may thus consider the LOI on this motion to dismiss.

In sum, because Cambridge Capital has not pleaded the existence of contracts arising from the Deal Points Memo or the December 1 phone call, Counts Three and Four for breach must be dismissed.

### E.    Count Five for Breach of the Covenant of Good Faith and Fair Dealing Should be Dismissed

Ruby Has argues that Count Five should be dismissed because a cause of action for breach of the implied covenant of good faith and fair dealing does not lie where there is no valid and binding contract from which such a duty would arise, and the LOI, the Deal Points Memo, and the December 1 conversation are not such contracts.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983). Accordingly, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Id.*  "The duty of good faith and fair dealing is a doctrine that reads into a contract a term that is not expressed but is necessary to give the agreement meaning and to prevent it from being illusory." *Scottsdale Ins. Co. v. McGrath*, 2021 WL 3077578, at *12 n.6 (S.D.N.Y. July 19, 2021).  It thus "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002).  "A party to a contract violates the covenant of good faith and fair dealing when the party 'directly violate[s] an obligation that may be presumed to have been intended by the parties.'" *Joshi v. Trustees of Columbia Univ. in City of New York*, 515 F. Supp. 3d 200, 221

(S.D.N.Y. 2021) (quoting *Thororoff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006)).  Absent a connection to an express or presumed contractual right or obligation, the doctrine "does not import a generalized code of good conduct into the law of contracts." *Scottsdale*, 2021 WL 3077578, at *12 n.6.

With respect to the LOI, Cambridge Capital's claim for breach of the covenant of good faith and fair dealing is dismissed as redundant.  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  Cambridge Capital alleges that Ruby Has breached its duty to act in good faith under the LOI.  But this claim rests on the same factual allegations as Counts One and Two, its claims for breach of the LOI and breach of a duty to negotiate in good faith, and does not seek relief different from that sought in the breach of contract claim or identify an obligation that should be implied in law aside from the obligation to negotiate in good faith.

Cambridge Capital's claim for breach of the covenant of good faith and fair dealing with respect to the Deal Points Memo and the December 1 "agreement" must also be dismissed.  It fails for two separate reasons.  First, "in order to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a valid contract with the defendant." *Coppelson v. Serhant*, 2021 WL 148088, at *9 (S.D.N.Y. Jan. 15, 2021).  The parties agree that there can be no breach of the covenant of good faith and fair dealing absent a valid contract. Dkt. No. 34 at 20.  As the Court held above, the Deal Points Memo and December 1 agreement are not binding contracts.  Thus, the claim must be dismissed for failure to allege this essential element of a claim for breach of the implied covenant.

Second, even if the Deal Points Memo and the December 1 call agreement created contractual obligations, Cambridge Capital's claim still would fail.  Cambridge Capital does not identify any obligation created by the covenant that Ruby Has violated.  The covenant of good faith and fair dealing is not a general code establishing some amorphous standard of good behavior between contracting parties.  It "applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'"  *Thororoff*, 460 F.3d at 407 (quoting *M/A-COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)); *see also S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. Feb. 17, 2021) (covenant is only breached where its application would not "negate the terms of the bargained-for clause" and is "necessary to preserve the fruits of a contract and prevent it from being illusory"); *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984) (stating that the significance of the covenant of good faith and fair dealing is in implying terms of an agreement to honor the reasonable expectations of the parties and is a surrogate for an implied obligation or limitation).  But Cambridge Capital does not specify any implied or presumed obligation that can be inferred from the expressed agreement that Ruby Has violated.  Its allegation is that Ruby Has violated the express provisions.  Its claim thus must succeed or fail as a contract claim; it cannot be alleged as a claim for breach of the covenant of good faith and fair dealing.

For these several reasons, Count Five is dismissed.

### F.    Count Six for Promissory Estoppel Should Be Dismissed

Ruby Has argues that Count Six, for promissory estoppel, should be dismissed because Cambridge Capital does not allege either a clear and unambiguous promise or reasonable reliance.  Cambridge Capital alleges that Ruby Has promised that it would act in good faith to consummate the transaction and that these promises were made on numerous occasions including ten listed dates.  Compl. ¶¶ 150-151.  Cambridge Capital alleges that in reliance on these

promises, it performed extensive services for Ruby Has and also passed on several investments in similar ventures including the opportunity to invest in ShipBob and ShipMonk.  *Id.* ¶¶ 152-153.

To state a claim for promissory estoppel, a party must allege "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by [the plaintiff]."  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quoting *Arcadian*, 884 F.2d at 73); *see also R.G. Group*, 751 F.2d at 79 (same); *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 46 N.Y.S.3d 99, 101 (1st Dep't 2017) (same).  "The doctrine of promissory estoppel can be invoked to enforce a promise, absent consideration, where there has been detrimental reliance, or to enforce a contract otherwise barred by the Statute of Frauds."  *Joshi v. Trustees of Columbia Univ. in City of New York*, 515 F. Supp. 3d 200, 223 (S.D.N.Y. 2021); *see also Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994) ("The modern doctrine of promissory estoppel may be invoked in two situations.  First, and most traditionally, the doctrine allows for the enforcement of a promise in the absence of bargained-for consideration.  This is known as the theory of detrimental reliance.  Promissory estoppel has also become increasingly available to provide relief to a party where the contract is rendered unenforceable by the Statute of Frauds.").

With a single exception, Cambridge Capital's allegations fail to state a claim for promissory estoppel for failure to allege either a "clear and unambiguous promise" or "reasonable and foreseeable reliance."  The Complaint alleges only that Ruby Has "promised that it would act in good faith to consummate a transaction by which Plaintiff would invest $40 million in exchange for a 51% stake in Defendant."  Compl. ¶ 150.  It then lists ten dates on which that promise was purportedly made.  *Id.* ¶ 151.  The first two correspond with the execution of the LOI.  *Id.* ¶¶ 45 (first signing of LOI), 46 (signing of new LOI).  The next three apparently coincide with the extension of the LOI.

*Id.* ¶ 44.  Nothing is alleged about the next four dates—in November 2020—other than that on those occasions Ruby Has made "promises to move forward in good faith."  *Id.* ¶ 57.  The last date is December 1, 2010.  On that date, Ruby Has allegedly "agreed to sign the deal documents immediately if Cambridge [Capital] promised to pay it an additional $2 million in cash at closing."  *Id.* ¶ 12.

Aside from with respect to the December 1, 2020 call, Cambridge Capital alleges no facts as to what Ruby Has promised about moving forward in good faith.  The allegations about promises made before December 1 must be dismissed for that reason alone.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel; the alleged promise must be clear and unambiguous."  *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 469 (S.D.N.Y. 2018) (quoting *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015)).  Cambridge Capital fails to plead sufficient factual material to allege a clear and unambiguous promise.

The promissory estoppel claim fails for other reasons as well.  To the extent Cambridge Capital would rely upon the execution of the LOI and the two alleged extensions of the Exclusivity Period, it does not allege "a promise, absent consideration, where there has been detrimental reliance."  *Joshi*, 515 F. Supp. 3d at 223.  Cambridge Capital obtained consideration for its agreement to not to engage in other projects and to provide advice and expend funds in due diligence and for the consummation of the transaction.  Ruby Has agreed to forego from any action to solicit or initiate a competing investment during a lengthy—and extended—period, and it agreed to expend its own resources to assist Cambridge Capital's due diligence.  *See Roth v. Isomed, Inc.*, 746 F. Supp.

316, 319 (S.D.N.Y. 1990) (forbearance "from doing that which a party has a legal right to do" is a form of consideration).  The LOI expressly reflects:  "Given that Cambridge Capital will defer other projects, deploy significant resources and incur material expenses in order to promptly try to consummate the Potential Transaction, [Ruby Has] will use their best efforts to make available all documents, facilities and personnel as requested so that [Cambridge Capital] can properly due diligence [Ruby Has] during the exclusivity period."  LOI at 5.  On each of the two succeeding months—in September and October 2020—Cambridge Capital allegedly received consideration in the form of an extension of the Exclusivity Period.  Cambridge Capital's remedy then, if any, for foregoing opportunities and for expending resources on Ruby Has would lie in the law of contract if it was denied the promised consideration.  It would not lie in the law of promissory estoppel.

Moreover, even if the LOI did not expressly recognize that Cambridge Capital would be expending resources on due diligence and foregoing opportunities and provide that the consideration for it doing so was Ruby Has's commitment to use "best efforts," the Complaint still would fail for absence of a clear and unambiguous promise upon which Cambridge Capital could reasonably rely.  Each of the alleged promises was accompanied by the express reservation by both parties that "any promise or agreement . . . was conditional upon the signing [or entry into] a written contract."  *R.G. Group*, 751 F.2d at 79.  That was explicit in the LOI; it also was implicit in the September and October agreements to extend the LOI and the Exclusivity Period.  "Under those circumstances there never was 'a clear and unambiguous promise' to [Cambridge Capital] that the [majority interest in Ruby Has] was theirs."  *Id.*  In addition,  any "claimed expenditures were made in expectation of, rather than in reliance on," a share purchase agreement.  *Id.*; *see also CKSJB Holdings*, 837 F. App'x at 905-06 (holding that allegations that the defendant promised to negotiate in good faith, made assertions to "treat the deal as done," and provided "other assurances" were insufficient to support a claim of reasonable reliance by the plaintiff in, among other things, rejecting offers from other companies and devoting substantial time, effort, and resources to the due diligence and contracting

processes); *Bennett*, 572 F. App'x at 84 (holding that any reliance that the plaintiff placed on oral promises of the defendant's representative that he would complete the investment that the parties had negotiated "was unreasonable as a matter of law because the oral promises were contradicted by writings signed by the parties . . . that stated that any binding agreement would result only from a formal, written contract and that the investment must win the approval of [defendant's] internal investment committee").

The only allegation of a clear and unambiguous promise made by Ruby Has upon which Cambridge Capital could reasonably rely is with respect to the December 1 call. Ruby Has allegedly promised "if you agree to $20M cash at close and no working capital, we will drop everything else" and that it would sign final transaction documents and deliver them to Cambridge Capital. Compl. ¶¶ 75, 77. But Cambridge Capital does not allege that it took any action or forewent any action in reliance upon this purported promise. Its claim of promissory estoppel is based on alleged "substantial services" it provided to Ruby Has, including: (1) restructuring its management team; (2) centralizing its accounting practices; (3) advising Ruby Has on how to properly accrue for freight costs; (4) advising Ruby Has on how to properly capture customer-level and site-level profitability; (5) providing it with a new technology strategy; (6) introducing it to numerous potential customers; and (7) identifying potential acquisition targets for Ruby Has, and on passing on investments in similar ventures. *Id.* ¶¶ 152-153. But none of that conduct is alleged to have taken place after December 1 or in reliance upon any promise made on December 1. No allegation is made that in relying on any particular promise, Cambridge Capital provided any particular service to its detriment. To the contrary, Cambridge Capital alleges that just about a week later, on December 9, 2020, the two companies parted ways. Thus, the claim with respect to December 1 fails as well, for the absence of any allegation of actual reliance and injury.

For these reasons, Count Six for promissory estoppel is dismissed.

### G.        Counts Seven and Eight for Quasi Contract Should Be Dismissed

Finally, Ruby Has argues that Cambridge Capital cannot recover in quasi-contract and

that the Court should dismiss Counts Seven and Eight, charging unjust enrichment and quantum

meruit, respectively.  In Counts Seven and Eight, Cambridge Capital alleges that it performed

extensive services for Ruby Has including: (1) restructuring its management team; (2)

centralizing its accounting practices; (3) advising Ruby Has on how to properly accrue for freight

costs; (4) advising Ruby Has on how to properly capture customer-level and site-level

profitability; (5) providing it with a new technology strategy; (6) introducing it to numerous

potential customers; and (7) identifying potential acquisition targets for Ruby Has.  Compl.

¶¶ 160, 167.  It alleges that Ruby Has was enriched at the expense of Cambridge Capital, and it

seeks to recover the value of the work that it performed or the compensation that it reasonably

expected from the delivery of those services.  *Id.* ¶¶ 161-163, 170.

Cambridge Capital's unjust enrichment and quantum meruit claims rise and fall together.

The Court "analyze[s] quantum meruit and unjust enrichment together as a single quasi contract

claim."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168,

175 (2d Cir. 2005); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F. Supp. 89, 96

(S.D.N.Y. 1991) ("[U]njust enrichment is a required element for an implied-in-law, or quasi

contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for

the breach of such a contract."), *rev'd on other grounds,* 959 F.2d 425 (2d Cir. 1992).  "In order

to recover in quantum meruit under New York law, a claimant must establish '(1) the

performance of services in good faith, (2) the acceptance of the services by the person to whom

they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of

the services.'"  *Mid-Hudson Catskill*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*,

221 F.3d 59, 69 (2d Cir. 2000)).  "[T]he claimant must have a reasonable expectancy of

receiving compensation." *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 513 (S.D.N.Y. 1997).

And to prevail on a claim for unjust enrichment under New York law, a plaintiff must

demonstrate "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity

and good conscience require restitution." *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir.

2009) (quoting *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d

573, 586 (2d Cir. 2006)).  "Unjust enrichment is available only in unusual situations when,

though the defendant has not breached a contract nor committed a recognized tort, circumstances

create an equitable obligation running from the defendant to the plaintiff." *Mahoney v. Endo

Health Sols., Inc.*, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (internal quotation marks

omitted).

Cambridge Capital has adequately pleaded that it provided services of value to Ruby Has.

However, Cambridge Capital has not pleaded the third element—that it had an expectation of

compensation or that it would be against equity and good conscience for Ruby Has to retain the

value of the work performed by Cambridge Capital.  The complaint does not allege that

Cambridge Capital had any expectation it would be compensated for the advice and other

services it provided.  It provided those services with the hope and the expectation that, if a

transaction was consummated, and it became the majority owner of Ruby Has, it would realize a

benefit from those services in the increased value of the Ruby Has enterprise—i.e., it "stood to

benefit economically from those services."  Dkt. No. 34 at 24.  That much is made clear by the

LOI which is incorporated by reference and upon which Cambridge Capital relies in its

pleadings.  The LOI lists the value Cambridge Capital can provide to Ruby Has and the services

it can perform and states "[w]ith Ruby Has's leadership *and our support*, we believe Ruby Has

possesses the potential to become a major winner in the realm of full-service third-party

fulfillment and related logistical services." LOI at 1 (emphasis added). In short, any value Cambridge Capital would receive would come only if it became a majority owner of Ruby Has and, even then, would come only in the form of the increased value of the shares that it would purchase in Ruby Has.

There is no factual allegation in the Complaint to support the proposition that Cambridge Capital had an expectation that it would be otherwise compensated for the value of its services and even if a transaction did not close. Nor is there an allegation that it would be unjust for Ruby Has to retain whatever value Cambridge Capital provided during the period of time the two were exploring a relationship. The services were provided gratuitously in the hope that there would be a transaction and value would be returned; they were not provided with any expectation that Cambridge Capital would be paid even if the two did not become business partners. *See Kossoff v. Felberbaum*, 281 F. Supp. 3d 454, 466 (S.D.N.Y. 2017) ("[A] party may not expect compensation for a benefit conferred gratuitously upon another." (alteration in original) (quoting *Umscheid v. Simnacher*, 482 N.Y.S.2d 295, 298 (2d Dep't 1984))).

For these reasons, Counts Seven and Eight are dismissed.

## II.    Cambridge Capital's Motion to Dismiss the Amended Counterclaims

The Court turns next to Cambridge Capital's motion to dismiss Ruby Has's Amended Counterclaims.

### A.    Counterclaim Count One for Common Law Fraud

Cambridge Capital argues that Ruby Has's fraud claim should be dismissed under Federal Rules of Civil Procedure 9(b) and 12(b)(6) for four independent reasons: (1) Ruby Has never identifies a false statement; (2) Ruby Has fails to plead scienter; (3) Ruby Has fails to plead reasonable or justifiable reliance; and (4) Ruby Has's proffered damages are not recoverable as a matter of law.

To state a claim for fraud under New York law, a plaintiff must allege "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Budhani v. Monster Energy Co.*, 2021 WL 1104988, at *12 (S.D.N.Y. Mar. 22, 2021) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).  Claims for fraud must also satisfy the heightened pleading requirements of Rule 9(b) and be pleaded "with particularity."  Fed. R. Civ. P. (9)(b); *see also B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 481 (S.D.N.Y. 2010). Under Rule 9(b), a plaintiff alleging that the defendant made false statements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields*, 25 F.3d at 1128). Particularity "means the who, what, where, when and how: the first paragraph of any newspaper story."  *Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, 2004 WL 51224, at *3 (S.D.N.Y. Jan. 9, 2004).

Ruby Has alleges that Cambridge Capital made false representations to it both before and during their negotiations.  It alleges that, at some unspecified time, it "explained" to Cambridge Capital "its anticipated cash needs, and the desire to have the capital by August or September for its use for the fourth quarter" and that "Gordon repeatedly represented to Ruby Has that it had the cash on hand available to close the potential transaction, and could meet Ruby Has' stated objectives."  Am. Countercl. ¶ 18.  Gordon also "advised" that "Cambridge [Capital] had more than $40 million in cash available to consummate the deal, and had even more than that if needed to buy out other equity holders."  *Id.*; *see also id.* ¶ 46 (alleging that Cambridge Capital made

"repeated representations that it had capital on hand and was ready to consummate the transaction if and when finalized").  Ruby Has also alleges that "[d]uring this time, Gordon also claimed that Cambridge [Capital] partners included successful people in the industry, available to work on Ruby Has' behalf if a deal closed," *id.* ¶ 20, and "represented to Ruby Has that he was a highly successful investment professional with demonstrated success in advising and investing in companies, and that he was [an] accomplished and trusted advisor of many companies" with "a pristine reputation in the industry," *id.* ¶ 21.  Ruby Has claims that "[t]hroughout the negotiations, including at this time," Cambridge Capital represented that it "work[ed] with existing management, rather than replacing them," *id.* ¶ 24, and "[d]uring their negotiations, Cambridge [Capital] held itself out to Ruby Has not only as knowledgeable and connected in the industry, but as a financially strong and stable company with many investments, and with access to substantial financial resources for Ruby Has going forward if needed," *id.* ¶ 25.  Ruby Has alleges that Cambridge Capital's representations were false and were made to induce Ruby Has first to sign the LOI and later to agree to an extension of the Exclusivity Period and to continue in the negotiations.

These allegations, however, fail to plead fraud with particularity.  The allegations that Cambridge Capital made misrepresentations "during this time" and "throughout the negotiations" are insufficiently specific about when the statements were made and therefore do not contain the particularity necessary to state a fraud claim in federal court and under New York law.  *See, e.g.*, *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995) (holding fraud claim was not stated with particularity where alleged misleading statement could have been made over a "period of several months"), *abrogation on other grounds recognized in Sirius Am. Ins. Co. v. SCPIE Indem. Co.*, 461 F. Supp. 2d 155, 160 (S.D.N.Y. 2006); *President*

*Container Grp. II, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 165 (S.D.N.Y. 2020) (finding that a "time range of several months is insufficient to plead fraud with particularity"); *Optima Media Grp. Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 144 (S.D.N.Y. 2019) (finding the "inexact and open-ended period" during which negotiations took place "is not sufficiently specific to satisfy Rule 9(b)").  The allegations also do not specify where or how the statements were made.  *See, e.g.*, *Optima*, 383 F. Supp. 3d at 143-44 (finding allegations insufficient where they do not "identify the continent, much less the city, in which the communications were made" and do not "offer an estimate of the number of such communications, or whether they were made 'in person, over the phone, or by email'").  The allegations also attribute some of these statements to Ruby Has generally without identifying a particular speaker.  *See Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 291 (S.D.N.Y. 1996) (holding that a complaint "must link the allegedly fraudulent statement to an individual speaker; attribution to a corporate entity or its representative is insufficient").

Ruby Has also fails to state how or why these statements were false or misleading, i.e., the underlying facts that made what Cambridge Capital said untrue.  Rule 9(b) requires that "the pleading explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Id.* at 174; *see also Coppelson*, 2021 WL 148088, at *7-8; *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006) ("Under the pleading requirements, a complaint must explain, with adequate specificity, why the alleged false or misleading statements were actually false or misleading when made.").  Ruby Has alleges, for example, that after "months of negotiations," Am. Countercl. ¶ 48, Cambridge Capital's recommended a candidate for CFO and its

introduction of a potential customer to Ruby Has gave Ruby Has "concern about . . . the extent to which Cambridge understood Ruby Has' business," *id.* ¶ 49; *see also id.* ¶ 50.  But the fact that Ruby Has allegedly rejected Cambridge Capital's recommendations does not mean that the firm lacked persons who were "knowledgeable and connected in the industry" or who could assist Ruby Has after the transaction closed.

Ruby Has alleges that Cambridge Capital's statements about its financial stability, the cash that it had on hand, and its ability to close a transaction were false because Smalley told Ruby Has "[i]n late September" that he, Gordon, and Cambridge Capital were "dependent on this proposed transaction," that "Cambridge [Capital] could cease to exist and Smalley and Gordon lose their positions if the transaction did not happen," and that "Gordon's intended $1 million investment out of the Cambridge [Capital] funds would be generated by refinancing his home." *Id.* ¶ 54.  Gordon also allegedly told Ruby Has that Cambridge Capital needed the funds generated from the proposed transaction to pay its staff and expenses.  *Id.* ¶ 55.  In November, Cambridge Capital told Ruby Has that it would need ten days after the Membership Interests Purchase Agreement was signed to consummate the transaction.  *Id.* ¶ 65.  Ruby Has's allegations are internally inconsistent.  At the same time as it alleges that these statements revealed that Cambridge Capital was not financially stable and would not have the funds available to invest in the transaction, it also alleges that it took seriously Cambridge Capital's alleged threat that if Ruby Has did not consummate the transaction, Cambridge Capital would invest in one of Ruby Has's competitors.  *Id.* ¶ 56.  The information gave Ruby Has concern that Cambridge Capital did not have the money to invest in it but at the same time had the money to invest in others.

In any event, the allegations do not demonstrate that the statements were false or misleading at the time that they were made.  The fact that the Ruby Has transaction was important to Cambridge Capital and that it could cease to exist if it did not engage in the transaction does not mean that it lacked the funds to engage in the transaction and would not be financially stable if it did so.  To the contrary, it tends to suggest that it had the funds to close the transaction—why pursue a transaction without the funds to close if its failure would end the firm.  Nor does the claim about how important the transaction was personally to Gordon or Smalley or how Gordon would fund his contribution say anything about Cambridge Capital's financial stability or ability to close.  That Gordon might refinance his house to generate the funds does not mean that he could not generate the funds by refinancing his house or that there were no other sources of funds available.  Finally, the fact that Cambridge Capital stated that it would be able to close in ten days from the signing of the agreement also tends to suggest the opposite of what Ruby Has would infer—that Cambridge Capital had the sources of funding available to close and just needed time to arrange the transfer of funds from those sources.

Finally, some of the alleged misstatements are "mere puffery" and are not sufficiently concrete to give rise to a claim for relief for fraud.  *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." (citing *Quasha v. American Natural Beverage Corp.*, 567 N.Y.S.2d 257, 257 (1st Dep't 1991))); *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 120 (S.D.N.Y. 2003) ("[R]epresentations constituting 'mere opinion or puffery' are 'not actionable representations of fact.'" (quoting *Reich v. Mitrani*, 701 N.Y.S.2d 368, 369 (1st Dep't 2000))); *Coppelson*, 2021 WL 148088, at *6 ("Statements that amount to 'little more than mere puffery, opinions of value or future expectations . . . do not constitute actionable fraud.'" (quoting

*Elghanian v. Harvey*, 671 N.Y.S.2d 266, 266 (1st Dep't 1998))).  For example, the claim that

"Cambridge partners included successful people in the industry," and that Gordon "was a highly

successful investment professional"—absent more—are not actionable and cannot give rise to

reasonable reliance.  *See Greenberg*, 282 F. Supp. 2d at 121 ("Courts have found parties'

assessment of their own abilities and successes to be non-actionable statements of opinion when

rendered in good faith.").

That said, two alleged misrepresentations are pleaded with greater particularity.  First,

Ruby Has alleges that, on September 8, 2020, before agreeing to extend the Exclusivity Period,

Zakinov asked Smalley to confirm whether Cambridge Capital had money on hand to make the

investment.  Am. Countercl. ¶¶ 41, 44.  Smalley responded that Cambridge Capital had "more

than $40 million on hand" and that one specific investor (whom he identified) had provided $30

million, another investor (named in the pleadings) provided $1 million, and other specified

parties had contributed funds.  *Id.* ¶ 44.  Ruby Has alleges that the representations regarding

commitments to Cambridge Capital were false and misleading because in November the

attorneys for Cambridge Capital stated that it did not "have written, binding commitments from

investors," which rendered it "unclear if, or when, the promised capital would be available if the

deal was finalized."  *Id.* ¶ 65.

Ruby Has adequately pleads facts that raise a strong inference that Smalley's statement

was false.  Smalley's alleged comment specified that different investors, some of whom were

identified by name, "had provided" or "had contributed" certain amounts of funding for the

transaction.  *Id.* ¶ 44.  The allegation is not that Smalley described investors who had lined up to

potentially finance the deal; instead, the allegation is that the funding had already been provided

or contributed.  This statement lies in stark relief to the statement by Cambridge Capital's

attorneys that the firm did not actually have "written, binding commitments from investors."
Paired together, these allegations are sufficient to raise the inference that Smalley's statement
was false.

Cambridge Capital argues that Ruby Has does not properly identify a false statement in
part because Ruby Has does not plead with particularity the attorneys' statement contradicting
Smalley's statement. Cambridge Capital overreads the particularity requirement. Rule 9(b)
requires a plaintiff to allege the "who, what, where, when and how" of the *false statement*—here,
Smalley's statement, which Ruby Has has pleaded with particularity. *Antigenics*, 2004 WL
51224, at *3. While Rule 9(b) also requires a plaintiff to explain why the statements were
fraudulent, it does not require any statements contained in the explanation to also be pleaded
with particularity. *See Novak*, 216 F.3d at 306 (requiring plaintiff to "(1) specify the statements
that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the
statements were made, and (4) explain why the statements were fraudulent"). Ruby Has pleads
the contents of the attorneys' statement—that, contrary to what Smalley had said, Cambridge
Capital did not have written, binding commitments from investors. No more is required under
Rule 9(b).

The second misrepresentation pleaded with particularity is Gordon's statements about the
SEC order. Ruby Has alleges that "[a]t a dinner in Las Vegas in October 2020," Gordon stated
that "he had been involved in one failed investment involving an unnamed Israeli company and
Cambridge [Capital] investors" and that he had been "defrauded," Am. Countercl. ¶ 68, and was
"a victim," *id.* ¶ 69. Even so, Gordon continued, Cambridge Capital investors "were upset with
him as a result," and he or Cambridge Capital had paid $100,000 to settle a lawsuit involving the
loss. *Id.* ¶ 68. Gordon did not disclose that the SEC had initiated an investigation into his

conduct and that he had accepted an order requiring him to cease and desist from securities

violations.  *Id.* ¶ 69.  Ruby Has claims that had Gordon told it about the SEC order  it "would not

have continued to negotiate the potential transaction with Cambridge [Capital] for more than six

weeks thereafter."  *Id.* ¶ 72.  Ruby Has claims only to have learned of the SEC order "[a]fter this

lawsuit was filed."  *Id.* ¶ 70.

      Cambridge Capital argues that Ruby Has fails to satisfy Rule 9(b) in connection with this

alleged misrepresentation.  But although Ruby Has fails to allege the precise date in October

2020 when the statements were made, it does adequately allege the who, what, where, and

approximately when.  *See Hansen v. Wwebnet, Inc.*, 2015 WL 4605670, at *10 (S.D.N.Y. July

31, 2015) ("[I]n keeping with the purpose of Rule 9(b), courts are willing to tolerate greater

ambiguity in a specified time period when, as a whole, other allegations about a fraudulent

statement provide a party with sufficient notice to prepare its defense.").  Ruby Has also alleges

in what respect the statement was misleading.  Gordon claimed he was a victim and disclosed the

private lawsuit without disclosing the SEC investigation or the consent order which was dated

June 19, 2019.  *Id.* ¶ 70.  The allegations thus satisfy Rule 9(b).

      Cambridge Capital also contends that Gordon had no duty to disclose the SEC order and

thus did not make a false or misleading statement.  Dkt. No. 46 at 12-13.  It characterizes Ruby

Has's allegation as one of pure omission.  "The law is well settled, however, that so-called 'half-

truths'—literally true statements that create a materially misleading impression—will support

claims for . . . fraud."  *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*,

*Gabelli v. S.E.C.*, 568 U.S. 442 (2013); *see also DirecTV Latin Am., LLC v. Park 610, LLC*, 691

F. Supp. 2d 405, 434 (S.D.N.Y. 2010) ("In the absence of a fiduciary relationship, 'a duty to

disclose may arise if: (1) one party makes a partial or ambiguous statement that requires

additional disclosure to avoid misleading the other party, or (2) one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" (quoting *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir. 1995))). Ruby Has alleges that Gordon made such a half-truth and an allegedly misleading statement by disclosing the private lawsuit and characterizing himself as a victim without also disclosing the SEC investigation and the order that resulted from it. Ruby Has therefore has pleaded an actionable misleading statement.

The Amended Counterclaims also sufficiently plead the remaining elements of fraud for the two misrepresentations pled with particularity. Cambridge Capital argues that scienter is not properly pleaded. "To prove scienter, a plaintiff must ultimately show that a defendant had knowledge of the falsity of the statement and an intent to defraud." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 438 (S.D.N.Y. 2017). "While knowledge and intent 'may be alleged generally,' under the pleading standard of Federal Rule of Civil Procedure 9(b), a court 'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.'" *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)). "[T]o survive a motion to dismiss under Rule 12(b)(6), [p]laintiffs must state facts sufficient to give rise to a strong inference of fraudulent intent." *Id.* (internal quotation marks omitted). A "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 291. "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one

could draw from the facts alleged.'"  *Silvercreek*, 248 F. Supp. 3d at 438-39 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176-77 (2d Cir. 2015)).

The Amended Counterclaims plead facts that constitute strong circumstantial evidence of Smalley and Gordon's conscious misbehavior or recklessness.  With respect to Smalley's comment, he allegedly spoke in definitive language—he specifically represented that particular investors "had provided" or "had contributed" certain amounts of funds.  The language admits of the interpretation that he had personal knowledge of the facts of which he was speaking.  He was not making a representation about corporate performance but about specific commitments that he claimed he knew had been made.  Accepting the allegations of the Amended Counterclaims, the representation was false.  As of November, just a couple of months later, the attorneys admitted that Cambridge Capital did not have "written, binding commitments from investors."  If it did not have the commitments in November, the inference is plain and compelling that it did not have them in September.  The inference also is plain and compelling that, when Smalley represented in September that Cambridge Capital had such investments he either knew what he was saying was false or was reckless with respect to whether it was true or false.  *See Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) ("A New York common law fraud claim is defined as a representation of fact, which is untrue and *either known by defendant to be untrue or recklessly made*, which is offered to deceive and to induce the other party to act upon it, and which causes injury" (emphasis added)); *Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 502 (S.D.N.Y. 2004) ("Under New York law, the scienter element of fraud requires that the plaintiff 'demonstrate that the defendant made a false representation which was either known to be untrue or made with reckless disregard of its truth and which was made with the intent to deceive and to induce the plaintiff to part with or

refrain from obtaining something of value, thereby causing injury.'" (quoting *Melia v. Riina*, 612 N.Y.S.2d 506, 508 (3d Dep't 1994))).  The existence of commitments in the millions of dollars for a transaction that Cambridge Capital was negotiating for months was not a minor or insignificant matter as to which Smalley might simply have been mistaken.  A factfinder could determine that it was material and that he knew that the statement was false.

Ruby Has also has pleaded scienter with respect to Gordon's statement.  Gordon's comments about being defrauded and about there being litigation that ensued were not made about some stranger or some other person.  He was speaking about himself and about a matter of extraordinary significance.  A factfinder could readily find, and the inference is strong, that when he referred only to the litigation and not to the SEC matter, he knew about the SEC matter and was knowingly and intentionally withholding it.

Cambridge Capital also argues that Ruby Has fails to allege justifiable reliance because Ruby Has is a sophisticated party required to conduct diligence to uncover the truth.[12]  "As a general matter, dismissals for failure to allege reasonable reliance are heavily disfavored.  As the Second Circuit has explained, 'the reasonableness of a plaintiff's reliance is a "nettlesome" and "fact-intensive" question, which we, like our Circuit's many district courts, will not lightly dispose of at the motion-to-dismiss stage.'"  *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 507 (S.D.N.Y. 2017) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015)).  Though this argument may ultimately carry the day, it is premature to rule on this fact-intensive question at this stage of the proceedings.

---

[12] Cambridge Capital also contends that no reliance could be pleaded because Gordon's statements occurred after Ruby Has entered into the LOI and extended the Exclusivity Period. Dkt. No. 46 at 14 n.2.  But this argument fails.  Ruby Has alleges that it relied on Gordon's statement to continue negotiations for an additional six weeks.  Am. Countercl. ¶ 72.

Lastly, Cambridge Capital argues that Ruby Has fails to plead out-of-pocket damages proximately resulting from the misrepresentations.  "In New York, as in multiple other states, the true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (internal quotation marks and alterations omitted). "Under that rule, damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. . . . There can be no recovery of profits which would have been realized in the absence of fraud." *Id.* (internal quotation marks and alterations omitted).  Here, Ruby Has alleges that it agreed to extend the Exclusivity Period based on Smalley's statement, among others, and that it engaged in additional weeks of negotiation in reliance on Gordon's statement.  Among other damages, Ruby Has alleges damages from its expenses (including attorneys' fees) incurred in the negotiations with Cambridge Capital that it would not have incurred but for the alleged misrepresentations.  Am. Countercl. ¶ 107.  Though all of the types of damages Ruby Has pleads may not be cognizable under New York law, it has sufficiently pleaded actual out-of-pocket damages.

In summary, Counterclaim Count One for fraud is dismissed except to the extent that it relies on Smalley's statement regarding specific investors and Gordon's statements regarding the SEC investigation and Consent Order.

### B.     Counterclaim Count Two for Breach of the NDA

In Counterclaim Count Two, Ruby Has alleges that Cambridge Capital breached the NDA by including in the Complaint in this action information that it learned during due diligence and negotiations of a potential investment.  This information includes information about Ruby Has's alleged previous investment raises; details about its principals' ownership interests and alleged payment therefor; details about internal restructuring plans and about its

employees, operations, and business plans; and information about Ruby Has's financial performance and value.  Am. Countercl. ¶ 112.  Ruby Has alleges that the information was not necessary to plead Cambridge Capital's claims and that it was included in the public court file without any effort to file the complaint under seal.  *Id.* ¶¶ 111, 113.

Cambridge Capital moves to dismiss this claim on two grounds: (1) the NDA expired on April 11, 2020, one year after it was executed, and well before Cambridge Capital filed its complaint on December 31, 2020; and (2) the counterclaim does not identify any "non-public information regarding Ruby Has."  Dkt No. 46 at 23-24.

The NDA is incorporated by reference into the Counterclaims.  Dkt. No. 41-1; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (holding that "statements or documents incorporated in [the complaint] by reference" were properly considered on motion to dismiss).  It is dated April 11, 2019 and was signed by Zakinov on behalf of Ruby Has and Gordon on behalf of Cambridge Capital.  It states explicitly:  "This agreement shall terminate one year from the date hereof."  There is no language that any of its provisions survive past that date.  The NDA recognizes that Cambridge Capital has requested "certain non-public information regarding Ruby Has" and defines as "Evaluation Material" "such information and any other information that we [Ruby Has] furnish to you."  Exhibit 1, NDA at 1.  Under the NDA, Cambridge Capital has the obligation (with limited exceptions) to deliver to Ruby Has the Evaluation Material in its possession and to "destroy all memoranda, notes, and other writings prepared by [Cambridge Capital or its agents] based thereon" upon Ruby Has's request.  *Id.*

Ruby Has argues that the best interpretation of the NDA, or at least a plausible interpretation that precludes dismissal, is not that Cambridge Capital's obligations to maintain the confidentiality of Ruby Has information terminates in one year but that only information

provided during the one year from April 2019 to April 2020 enjoys confidentiality.  It does not

provide an alternative date by which information provided by Ruby Has is no longer considered

confidential and can be disclosed by Cambridge Capital.

Much of the information in the Complaint alleged to be confidential by Ruby Has relates

to either business terms Ruby Has was willing to agree to (including its willingness to enter into

the LOI and the LOI's contents) or the advice it took from Cambridge Capital.  While the terms

and advice provided by Cambridge Capital to Ruby Has are not reasonably understood as non-

public information regarding Ruby Has, the fact that Ruby Has accepted or proposed terms and

followed the advice is non-public information regarding Ruby Has.  *See e.g.*, Compl. ¶¶ 5 (fact

that Ruby Has signed LOI in June 2020), 38 (terms of LOI agreed to by Ruby Has), 51 (Ruby

Has policies on accounting adopted in response to Cambridge Capital advice), 53 (Ruby Has

negotiations regarding forgiveness of PPP loan), 65 (contents of Deal Points Memo agreed to by

Ruby Has), 88 (valuation Ruby Has had accepted for its business when it negotiated the LOI and

valuation Ruby Has demanded in December 2020).  The Complaint also contains information

about Ruby Has's financial performance after May 2020.  *See, e.g.*, *id.* ¶ 60 (alleging that Ruby

Has missed its working capital and cash balance forecasts meaningfully from what it sent

Cambridge Capital in May 2020).  Other information allegedly regarding Ruby Has dates from

the period from April 2019 to April 2020 or before.  *See, e.g.*, *id.* ¶¶ 30, 31, 34.  The Court

accepts Ruby Has's allegation that such information is confidential at this stage.

Accepting those allegations as true, however, Counterclaim Two fails to allege a breach

of the NDA.  The NDA states that "[t]his *agreement* shall terminate one year from the date

hereof."  Exhibit 1, NDA at 2 (emphasis added).  Under the NDA, Cambridge Capital agreed

"not to use any of the Evaluation Material in any way for any purpose other than in connection

with the purposes for which such material has been provided to you." *Id.* at 1.  The NDA

expired on April 11, 2020, and with its expiration so too did Cambridge Capital's obligations

under the NDA.  That is the meaning of the termination of a contract.  *See M & G Polymers*

*USA, LLC v. Tackett*, 574 U.S. 427, 441-42 (2015) (discussing "the traditional principle that

contractual obligations will cease, in the ordinary course, upon termination of the . . .

agreement").  Ruby Has could have negotiated for a provision that the obligation of

confidentiality would survive the termination of the contract.  It did not do so.  Absent the

parties' agreement to such a provision, the Court will not read one into the contract.  *See*

Commercial Contracts: Strategies for Drafting and Negotiating § 12.05[A][19], Survival Clause

("If one party wishes certain provisions to continue on into the future despite the termination of

the contract, the writing should so state in an additional clause.  Such may be the case if one of

the parties wishes certain information to remain confidential for a period longer than the contract

duration.  The drafter should list the specific provisions that are subject to the

survivorship clause.").

The NDA's language does not support Ruby Has's argument that the one-year period

from April 2019 to April 2020 delimits what *information* provided by Ruby Has to Cambridge

Capital must be kept confidential rather than the time during which Cambridge Capital is

required to keep that information confidential.  To the contrary, the NDA expressly requires

Cambridge Capital to keep information "furnished before . . . the date of this letter"—i.e.,

preceding the term of the NDA—confidential during the term of the agreement.  It thus explicitly

covers information provided before April 2019 and cannot be read to address the scope of the

information required to be kept confidential rather than the term during which Cambridge

Capital is required to keep it confidential.

Moreover, reading the one-year termination date to apply to the term of the NDA does not, as Ruby Has argues, lack commercial sense.  "The Court must avoid interpreting a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'"  *Landmark Ventures, Inc. v. Wave Sys. Corp.*, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (quoting *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 561 (1st Dep't 2003)).  At the time the NDA was entered in April 2019, neither party knew whether the initial "brief discussions" they had had up to that time or contemplated having in the next few months would grow into something more.  Am. Countercl. ¶ 14.  In fact, the Amended Counterclaims themselves allege that the previous conversations between Ruby Has and Cambridge Capital in 2018 consisted of "a single discussion" and that "communications went no further."  *Id.* 12.  And, as it turned out, Ruby Has again had only "brief discussions" with Cambridge Capital in 2019 before Cambridge Capital submitted an offer on May 23, 2019 that was rejected on June 24, 2019.  *Id.* ¶ 14.  Thus, measured from what the parties understood at the time the time the NDA was agreed upon, it would be perfectly plausible for them to have negotiated a term ending in April 2020—there was no necessary reason to believe as of April 2019 that the information would be extensive in amount or sensitive in nature, such that it could not have been disclosed in April 2020 without harm to Ruby Has.  The parties did include in the NDA a provision requiring Cambridge Capital to return that information and destroy all writings based upon it save for those "required to be retained by [Cambridge Capital's] internal processes," if Ruby Has requested.  Exhibit 1, NDA at 1.  There also was nothing in the NDA that would have precluded the parties from agreeing to extend the obligation of confidentiality to a further time certain in the future, if Ruby Has would be providing information the future disclosure of which would cause harm or would be providing information after April 2020.  It

thus admitted of measures that could be taken by Ruby Has if it wanted further protection than that it received from Cambridge Capital's pledge of confidentiality to April 2020.  That Ruby Has did not avail itself of these measures does not provide grounds for the Court to impose on Cambridge Capital obligations it did not expressly assume at the time of contracting.[13]

Indeed, it is Ruby Has's interpretation that would violate fundamental principles of contract law.  A "traditional principle" of contract law is that "courts should not construe ambiguous writings to create lifetime promises."  *M & G Polymers*, 574 U.S. at 441 (citing 3 A. Corbin, Corbin on Contracts § 553 (1960)).  Ruby Has's interpretation would have Cambridge Capital agree indefinitely to keep Ruby Has's information confidential.  Under Ruby Has's interpretation, Cambridge Capital would be liable for breach of the NDA if 15 or 20 or 50 or more years after the event, it somehow let slip information about Ruby Has's financial performance in 2020 or the terms under which it was willing to sell a portion of its company to Cambridge Capital.  The law, however, disfavors agreements to keep non-trade-secret information confidential for a duration that is not limited even where the agreement is drafted explicitly to contain no limitation.  *See, e.g.*, *Denson v. Donald J. Trump for President, Inc.*, 2021 WL 1198666, at *14 (S.D.N.Y. Mar. 30, 2021) (finding confidentiality provision unenforceable under New York law in part because the provision had no time limitation); *Foster Cable Servs., Inc. v. Deville*, 368 F. Supp. 3d 1265, 1274 (W.D. Ark. 2019) (stating that, under Arkansas law, the fact that a confidentiality agreement "does not state a time limitation, but instead applies forever, further supports a finding that it is unenforceable"); *Howard Schultz & Assocs. of the Se., Inc. v. Broniec*, 236 S.E.2d 265, 270 (Ga. 1977) ("The nondisclosure covenant

---

[13] The LOI contains a confidentiality provision.  It prohibits Ruby Has—but not Cambridge Capital—from disclosing any nonpublic information about Ruby Has to others except in the ordinary course of business.  LOI at 4.

here contains no time limitation and hence it is unenforceable."); *Nalco Chemical Co. v. Hydro Technologies, Inc.,* 984 F.2d 801, 804 (7th Cir. 1993) (holding that confidentiality clause without "a durational limitation on the dissemination" of confidential information is void and unenforceable under Wisconsin law). Here, where the agreement is drafted to limit the duration of Cambridge Capital's confidentiality obligation, the Court will not read it to eliminate that limitation. Cambridge Capital's interpretation is the better and the only plausible interpretation of the NDA.

Lastly, Ruby Has responds by pointing to paragraph 16 of its Amended Counterclaims. That paragraph, which was added after Cambridge Capital's initial motion to dismiss, states that "[o]n or about May 14, 2020," in a telephone call, Ruby Has and Cambridge Capital "agreed . . . to continue the NDA to cover the parties' then-commencing negotiations regarding a possible investment in Ruby Has." Am. Countercl. ¶ 16. It alleges that the agreement was confirmed orally during discussions between the parties in October 2020 and in writing by emails, including July 2020 emails in which Smalley stated that Cambridge Capital would honor the NDA "in all respects." *Id.*

That paragraph does not do the work necessary for Ruby Has for a different reason. As discussed before, to state a breach claim, a plaintiff must sufficiently plead the existence of a contract by providing factual allegations regarding its formation, the date it took place, and the contract's material terms. *See Ebomwonyi*, 473 F. Supp. 3d at 347. Conclusory allegations that a contract existed do not suffice. *Id.* And absent a meeting of the minds on material terms, no contract can exist. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) ("It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.' The manifestation of mutual assent must be

sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citation omitted)).

The Amended Counterclaims do not allege a meeting of the minds on any of the material terms of an agreement.  It alleges that in May 2020, the parties agreed that they would be bound by the earlier written NDA.  But not only had that NDA expired by the time of the alleged May 2020 conversation, so too had any obligations of confidentiality it had created.  As of May 2020, Cambridge Capital had the unfettered right to disclose any of Ruby Has's information—even that information that had previously been provided pursuant to the NDA.  Thus, the allegations do not describe a meeting of the minds in May 2020 on any of the terms of a non-disclosure agreement.  Reference to the April 2019 NDA cannot supply an agreed term during which Cambridge Capital was to keep Ruby Has's newly-provided information confidential as that term had already ended.  It does not describe the type of information that would be considered by the parties to be confidential.  It also does not describe what obligations were imposed by the supposed confidentiality agreement, including what measures the parties were required to take to keep confidentiality and whether those obligations were reciprocal.  Taking the allegations as pleaded, the terms are "vague and indefinite" such that "there is no manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *See Denson*, 2021 WL 1198666, at *16 (internal quotation marks omitted).  Without such facts about the terms of the agreement, the pleadings cannot state a claim for breach of contract.

### C.  Counterclaim Count Three for Tortious Interference with Prospective Business Relations

Ruby Has's third counterclaim asserts that all Counterclaim Defendants committed the New York tort of tortious interference with prospective business relations.  Ruby Has alleges that

Counterclaim Defendants tortiously interfered with its relationship with potential third-party investors in Ruby Has in two ways: by "(i) encouraging Ruby Has to enter into the Exclusivity Period agreement, its extension, and negotiations of a potential deal based on false and misleading information, and/or (ii) filing this lawsuit in the public file containing misrepresentations about Ruby Has and gratuitously disclosing confidential information about Ruby Has and the alleged deal terms of the potential transaction with Cambridge [Capital], and demanding enormous damages from the company on groundless claims." Am. Countercl. ¶ 119. Ruby Has does not identify the prospective investors except to say that there were "multiple companies that approached Ruby Has regarding a potential investment during the Exclusivity Period or during its negotiations with Cambridge [Capital]" and that "[u]pon information and belief, Ruby Has would have entered into an investment transaction with one of those investors but for Counterclaim Defendants' conduct." *Id.* ¶¶ 117-118.

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)); *see also Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003); *Goldman v. Reddington*, 2019 WL 4736803, at *9 (S.D.N.Y. 2019) (same); *Leadsinger, Inc. v. Cole*, 2006 WL 2320544, at *12 (S.D.N.Y. 2006) (same).

Cambridge Capital argues that the allegations fail to state a claim for relief because Ruby Has fails to (1) identify a "particular, existing business relationship through which plaintiff

would have done business but for the allegedly tortious behavior," Dkt. No. 46 at 17 (quoting *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995)); (2) allege that Cambridge Capital knew of the specific relationship and intended to interfere with it; (3) allege direct interference; (4) allege Cambridge Capital acted solely out of malice or used dishonest, unfair, or improper means; or (5) allege that Cambridge Capital's interference caused an injury to the relationship.  The Court turns to each allegation in turn.

### 1.  Fraudulent Inducement of the LOI and Extension of Exclusivity

Ruby Has argues first that it has alleged that Cambridge Capital engaged in dishonest, unfair, or improper conduct and that it interfered with Ruby Has's relationship with six prospective investors because it fraudulently induced Ruby Has into "executing and extending the exclusivity agreement, and the negotiations," Dkt. No. 48 at 21, and because, as a result, Ruby Has was unable to pursue overtures from potential investors due to the exclusivity agreement.

Ruby Has's claim fails because it has not alleged that Cambridge Capital engaged in the wrongful conduct with knowledge of the plaintiff's relationship with a third party and with the intent to interfere with that relationship.

In particular, Ruby Has has not alleged that at the time the parties entered into the LOI or agreed to the extension, Cambridge Capital knew that others had expressed interest in purchasing Ruby Has.  There is no claim that, at the time Ruby Has and Cambridge Capital agreed to the LOI, Ruby Has had been approached by or had had conversations with any third parties, much less that Cambridge Capital would have had the intent to interfere with those relationships.  With respect to after the LOI, Ruby Has alleges that "Ruby Has had been approached by a number of potential investors" and that "[i]n each instance, . . . Ruby Has refused to engage with them in

respect for its exclusivity obligations to Cambridge [Capital]," *id.* ¶ 43, and that "[w]ith these concerns in mind, [it] sought confirmation from Cambridge [Capital] that the funds need for the investment were already raised and on hand at Cambridge [Capital]," *id.* ¶ 44.  But it does not allege that it told Cambridge Capital that there were investors who had expressed interest in Ruby Has or that Cambridge Capital independently knew of the existence of such potential investors.  Thus, there are no factual allegations in the Amended Counterclaims to support that Cambridge Capital knew about the other potential investors at the time of any of its alleged wrongful conduct.

Moreover, even if Ruby Has had alleged that Cambridge Capital knew that others were potentially interested in making an investment in Ruby Has, Cambridge Capital's alleged conduct in negotiating a LOI and in insisting on an Exclusivity Period (even if it made false representations in doing so) would not constitute tortious interference unless Cambridge Capital did so solely for the impermissible purpose of preventing another potential purchaser from investing.  *See In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 480 (S.D.N.Y. 2013) (finding failure to plead claim for tortious interference where "defendants acted in their own economic self-interest and therefore did not act *solely* to harm [plaintiff]").  Ruby Has's allegations fall short here as well.  There are no well-pleaded allegations that Cambridge Capital was *not* interested in purchasing Ruby Has at all relevant times.  Cambridge Capital pursued Ruby in 2009, Am. Countercl. ¶ 12, and reached out again in April 2020, *id.* ¶ 15.  Ruby Has itself alleges that Cambridge Capital thereafter engaged in "rounds of negotiations of deal terms that continued for months," *id.* ¶ 35, "attempted to negotiate . . . proposed deal points," *id.* ¶ 37, engaged in due diligence "[t]hroughout the summer and fall," *id.* ¶ 39, and sent an invoice for $400,000 in expenses allegedly incurred to explore the potential transaction, *id.* ¶ 82.  The deal

fell apart only after the parties could not agree upon terms.  The Amended Counterclaims themselves allege the precise opposite of conduct engaged in for the sole purpose of interfering with Ruby Has's relationships with others; Cambridge Capital engaged in the conduct to pursue its own interests, regardless whether others also were interested in Ruby Has.  Assuming that Cambridge Capital intentionally made false representations of fact to induce Ruby Has to agree to the LOI and to an extension of exclusivity, Ruby Has's remedy would lie in the law of fraud. Those allegations would not give rise to a claim for tortious interference.

Ruby Has's allegations that Cambridge Capital committed tortious interference by its conduct in negotiating the LOI and the extension of exclusivity fail for one additional reason. Ruby Has has not identified any specific business relationship with which Cambridge Capital interfered.  "In order to survive a motion to dismiss, the plaintiff must allege that it was 'actually and wrongfully prevented from entering into or continuing in a *specific* business relationship.'" *Von Rohr Equip. Corp. v. Tanner Bolt & Nut Corp.*, 2017 WL 5184676, at *7 (E.D.N.Y. Nov. 7, 2017) (quoting *Korn v. Princz*, 641 N.Y.S.2d 283, 283 (1st Dep't 1996)); *see also Deaton v. Napoli*, 2019 WL 4736722, at *8 (E.D.N.Y. Sept. 27, 2019) ("Failure to identify a specific business relationship with a third party is a 'fatal' deficiency to pleading tortious interference."); *Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry*, Inc., 2018 WL 1027754, at *5 (S.D.N.Y. Feb. 20, 2018) ("[C]ourts in this District are clear that where a party cannot identify specific third party relationships that were disrupted, a tortious interference claim cannot lie."); *American Lecithin Co. v. Rebmann*, 2017 WL 4402535, at *23 (S.D.N.Y. Sept. 30, 2017) ("[T]he complaint must allege 'interference with a specific identified business relationship with a third party.'" (quoting *Camp Summit of Summitville, Inv. v. Visinski*, 2007 WL 1152894, at *14 (S.D.N.Y. Apr. 16, 2007))); *Shah v. Lumiere*, 2013 WL 6283585, at *2 (S.D.N.Y. Dec. 3, 2013)

("Plaintiff has not alleged interference with a specific business relationship, which is necessary to plead sufficient allegations under the first two elements of a claim for tortious interference with prospective business relationships.").

Ruby Has argues that it has satisfied this requirement because the Amended Counterclaims allege that "[d]uring the negotiations with Cambridge [Capital], including during the four-month Exclusivity Period, [it] was approached by no fewer than six potential investors interested in investing in the company." Am. Countercl. ¶ 101; *see also* Dkt. No. 48 at 19-20.  It claims that it "did not specify the names of the potential investors because the effort is ongoing, and disclosure in a public pleading may undermine that effort."  Dkt. No. 48 at 20 n.8.  It provides that "[d]etails can be revealed in discovery with appropriate protections." *Id.*  But Ruby Has was not faced with such a Hobson's choice.  It need not have either disclosed names publicly or been precluded from pursuing a claim of tortious interference.  It could have sought leave to file a portion of its complaint under seal.  *See Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 421 n.16 (S.D.N.Y. 2016) (noting that the "proper solution to [confidentiality] concerns is for counsel to file [a complaint] under seal . . . while the Court determines if there is indeed a need for such redaction").

What it could not do is what it did.  It could not allege generally and vaguely that there were third parties who had approached it without providing some identifying information to determine that there were in fact such third parties and to permit Cambridge Capital to challenge the allegation.  To hold otherwise would be to permit Ruby Has to get to discovery based on "labels and conclusions" and not facts.  *See In re Int. Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 709-10 (S.D.N.Y. 2018) (finding plaintiff's allegation that it had "business relationships with numerous buy-side customers including Buy Side Client 1 through 16" in support of its

tortious interference claim "too vague to survive" dismissal); *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 1997 WL 525403, at *2 (S.D.N.Y. Aug. 21, 1997) (concluding that plaintiff's "vague allegation" that defendant "interfered with 'at least 5 prospective customers' is inadequate as a matter of law").

For these reasons, the Amended Counterclaims thus fail to state a claim under this theory of tortious interference.

### 2.   The Malicious Filing of the Lawsuit

Ruby Has also alleges that Cambridge Capital engaged in tortious interference by filing the Complaint in this action.  It alleges that the Cambridge Capital's lawsuit "was designed to destroy Ruby Has' prospects of procuring an investment from others after Ruby Has exercised its clear right in December 2020 to discontinue negotiations with Cambridge [Capital]."  Am. Countercl. ¶ 1.  Cambridge Capital's claim of "'hundreds of millions of dollars' of damages" was "designed solely to deter potential investors."  *Id.* ¶ 89.  It pleads that it has been "advised that the existence of th[e] lawsuit . . . will materially and adversely impact the price and other terms of potential deals with other investors, and may deter some potential investors from investing at all."  *Id.* ¶ 95.

This claim suffers from many of the same defects as Ruby Has's other tortious interference theory.  Ruby Has does not allege that the Complaint interfered with any specific business relationship or that Cambridge Capital knew of these specific business relationships.  Vague allegations about "potential investors" does not suffice.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010) ("[T]he complaint fails entirely to describe any third party with whom [plaintiff] had prospective business relations to be interfered with.  The lack of such an allegation is fatal to this claim." (citation omitted)).  The Complaint is also founded on speculative injury.  The advice from the investment banker that the Complaint might interfere

with Ruby Has's ability to make a deal does not establish that Ruby Has "would have entered into an economic relationship but for [Cambridge Capital's] wrongful conduct." *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014).

In addition, the counterclaim fails to allege improper conduct because Cambridge Capital is shielded from liability for filing the complaint by the *Noerr-Pennington* doctrine. "The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of a prior court proceeding." *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002). The only exception is when the litigation is sham: when it "is (1) 'objectively baseless' and (2) intended to cause harm to the defendant 'through the use [of] governmental *process*—as opposed to the *outcome* of that process.'" *Id.* (alteration in original) (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)). "[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Pro. Real Est. Invs.*, 580 U.S. at 57. "Courts routinely apply the *Noerr-Pennington* doctrine when assessing tortious interference claims." *Lewin v. Richard Avedon Found.*, 2015 WL 3948824, at *27 (S.D.N.Y. June 26, 2015).

The thrust of Ruby Has's argument is that the allegations in Cambridge Capital's lawsuit are "groundless." Am. Countercl. ¶ 123. Ruby Has states that the Complaint is based on "false information," *id.* ¶ 84,[14] and then lists a number of allegations that it says are false or misleading, *id.* ¶¶ 86-89, 91-94. Ordinarily, the analysis whether a complaint is "objectively baseless," however, is directed to the face of the complaint. *See Agfa Corp. v. United Mktg. Grp., Inc.*, 2003 WL 21555087, at *3 (S.D.N.Y. July 10, 2003); *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002) ("Where possible, . . . this

---

[14] Ruby Has also alleges that the Complaint discloses confidential business information in violation of the NDA, *id.* ¶¶ 84, 90, but that argument does not prevail for reasons stated above.

analysis should be addressed to the face of the complaint, in order to avoid chilling a litigant's exercise of the right to petition."). A claim for tortious interference is not a vehicle a party can use to chill the resolution of disputed factual questions. Other tools exist to address groundless lawsuits. *See, e.g.*, Fed. R. Civ. P. 11; *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, 2020 WL 1330283, at *4 (S.D.N.Y. Mar. 22, 2020) (tort of malicious prosecution requires proof of "(1) the commencement or continuation of a . . . proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of [plaintiff], (3) the absence of probable cause for the . . . proceeding and (4) actual malice").[15]  This Court already has determined that Cambridge Capital's claims state a claim. There is no well-pleaded allegation that they are objectively baseless.

Nor does Ruby Has include well-pleaded allegations that the lawsuit was intended to cause harm to "through the use [of] governmental *process*—as opposed to the *outcome* of that process," much less to interfere with Ruby Has's business relationships. *T.F.T.F. Capital*, 312 F.3d at 93 (quoting *Pro. Real Est. Invs.*, 508 U.S. 49 at 60-61); *see also Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 354-55 (S.D.N.Y. 1997) ("A lawsuit constitutes 'improper means' if the litigant has no belief in the merit of the litigation, or having some belief in the merit, institutes or threatens to institute the litigation in bad faith, intending only to harass third parties and not to bring the claim to adjudication."). Ruby Has alleges that Cambridge Capital

---

[15] The issues Ruby Has raises here—whether the LOI creates binding obligations (Am. Countercl. ¶ 86), whether the Exclusivity Period was extended a second time (*id.* ¶ 87), whether Ruby Has had conversations with potential bidders during the Exclusivity Period (*id.* ¶ 88), whether Cambridge Capital added value to Ruby Has during the negotiations via its consulting advice (*id.* ¶ 91), and the nature of the tax planning done by Ruby Has (*id.* ¶ 92)—are each hotly contested and, to some extent, matters of characterization. It is not disputed that Cambridge Capital provided consulting to Ruby Has, just whether that advice added value. Nor is it disputed that Ruby Has tried to negotiate the potential transaction to maximize tax efficiency, just whether the structure it proposed was "highly unorthodox."

brought this lawsuit to force Ruby Has to "pay[] [it] off" to drop the case, Am. Countercl. ¶ 85, and "to force a settlement," *id.* ¶ 94.  Litigants frequently hope that there will be a settlement rather than that a case will go its distance to a final judgment.  Assuming that Cambridge Capital has that motive, that would not take its claim outside the protection of the *Noerr-Pennington* doctrine or make its conduct tortious.

### D.    Counterclaim Count Four for Prima Facie Tort

In Counterclaim Count Four, Ruby Has alleges that Cambridge Capital committed a prima facie tort by filing this lawsuit, which it claims is groundless, contains numerous materially false and damaging allegations about Ruby Has and the negotiations, and discloses confidential information.  Am. Countercl.  ¶ 123.

The elements of a claim of prima facie tort are "(1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful." *Hughes v. Patrolmen & Benev. Ass'n of City of New York, Inc.*, 850 F.2d 876, 882 (2d Cir. 1988).  "Prima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a catch all alternative for every cause of action which is not independently viable." *Backer v. Cooperatieve Rabobank U.A.*, 338 F. Supp. 3d 222, 232 (S.D.N.Y. 2018).  To plead a claim in prima facie tort, plaintiff must allege that "malevolence is the sole motive for defendant's otherwise lawful act or, in Justice Holmes' characteristically colorful language, [that] defendant [has] act[ed] from 'disinterested malevolence.'" *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333 (N.Y. 1983) (quoting *Am. Bank & Tr. Co. v. Fed. Rsrv. Bank of Atlanta*, 256 U.S. 350, 358 (1921)); *see also Allen v. Cox*, 2011 WL 2436705, at *3 (S.D.N.Y. June 16, 2011) ("[T]he complaint must allege that the defendant was motivated solely by the malicious intention to injure the plaintiff."); *Greater Buffalo*

*Accident & Inj. Chiropractic, P.C. v. GEICO Cas. Co.*, 175 A.D.3d 1100, 1101 (4th Dep't 2019) ("[T]he prima facie tort cause of action cannot stand because, although the complaint alleged that defendant 'acted maliciously' and 'with disinterested malice,' it did not allege that defendant's 'sole motivation was "disinterested malevolence."'" (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333 (N.Y. 1983)).  "[M]otives of profit, economic self-interest or business advantage are by their terms not malicious, and their presence, even if mixed with malice or personal animus, bars recovery under prima facie tort." *Belda v. Doerfler*, 2015 WL 5737320, at *12 (S.D.N.Y. Sept. 15, 2015) (quoting *Rodgers v. Grow-Kiewit Corp.-MK*, 535 F. Supp. 814, 816 (S.D.N.Y. 1982)).

Ruby Has's allegations fail to state a claim for prima facie tort.  Although Ruby Has alleges in conclusory terms that Cambridge Capital acted "maliciously" and "out of spite and revenge," Am. Countercl. ¶ 125, it alleges no facts to support the claim that Cambridge Capital acted with "disinterested malice."  To the contrary, Ruby Has alleges that Cambridge Capital acted to extract a settlement out of a view—perhaps misguided (based on what the evidence may or may not show)—that Ruby Has wronged it by failing to pay its expenses and to complete a transaction.  Those motives of economic self-interest and business advantage bar recovery in prima facie tort.  Accordingly, Counterclaim Count Four will be dismissed.

## III.    Leave to Amend

Both Cambridge Capital and Ruby Has request leave to amend should the Court dismiss any portion of their pleadings.  *See* Dkt. No. 34 at 24; Dkt. No. 48 at 25.  A court "should freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  At the same time, leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d

16, 28 (2d Cir. 2016) (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d

Cir. 2008)).  "[I]t is within the sound discretion of the district court to grant or deny leave to

amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  The Court

grants Cambridge Capital leave to amend its pleadings with respect to the second extension of

the Exclusivity Period under Count One.  The Court grants leave to Ruby Has to amend its

pleadings with respect to Counterclaim Counts One and Two.

## CONCLUSION

Ruby Has's motion to dismiss the Complaint is GRANTED IN PART and DENIED IN

PART.  Cambridge Capital's motion to dismiss the Amended Counterclaims is GRANTED IN

PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 10 and 45.


SO ORDERED.


Dated: September 30, 2021
      New York, New York                    _____
                                                 LEWIS J. LIMAN
                                             United States District Judge